T.C. Memo. 2016-103

UNITED STATES TAX COURT

RICKEY L. DRILLING, Petitioner <u>v</u>. COMMISSIONER
OF INTERNAL REVENUE, Respondent

Docket No. 6347-12L.                     Filed May 25, 2016.

<u>R. Jeanette Parham</u>, for petitioner.

<u>David Baudilio Mora</u>, for respondent.

CONTENTS

FINDINGS OF FACT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  3

1.    Drilling's Form 1040EZ for 2007. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  3

2.    The IRS's notice to Drilling that it had filed a notice of lien; Drilling's
      initial collection-review hearing before the Appeals Office. . . . . . . . . . . . . 6

3.    Drilling's petition, the Court's remand order, and the supplemental
      collection-review hearing. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

4.    Trial . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .38

[*2] OPINION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

1.    Withdrawing notice of lien or releasing lien for 2007. . . . . . . . . . . . . . . 39

2.    The $4,000 offer-in-compromise.. . . . . . . . . . . . . . . . . . . . . . . . . . . 53

      a.    Reasonable collection potential .. . . . . . . . . . . . . . . . . . . . . . 54

      b.    Special circumstances. . . . . . . . . . . . . . . . . . . . . . . . . . . . 61

      c.    Counteroffer. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 62

3.    Correction of amounts of tax liabilities. . . . . . . . . . . . . . . . . . . . . . 63

4.    Conclusions. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 70

MEMORANDUM FINDINGS OF FACT AND OPINION

MORRISON, <u>Judge</u>:  This is an appeal pursuant to sections 6320(c) and 6330(d)(1)[1] by which petitioner Rickey L. Drilling seeks this Court's review of a determination of the Appeals Office of the Internal Revenue Service (IRS) sustaining the filing of a notice of federal tax lien for the tax years 2004, 2005, and 2007.  That determination was made after the Appeals Office had conducted a collection-review hearing under section 6330(b) and a supplemental collection-review hearing pursuant to a remand by this Court.  The determination was made

---

[1]Unless otherwise indicated, all section references are to the Internal Revenue Code (26 U.S.C.) as amended and in effect at all relevant times.  All Rule references are to the Tax Court Rules of Practice and Procedure.

**[*3]** in a supplemental notice of determination dated July 29, 2013. It is described

infra pp. 32-38. We hold that the Appeals Office did not err in its determination.

FINDINGS OF FACT

When he filed the petition, Drilling was a resident of Texas.

1.      Drilling's Form 1040EZ for 2007

April 15, 2008, was the filing deadline for Drilling's 2007 federal-income-

tax return. On or before that date, Drilling filed a Form 1040EZ, "Income Tax

Return for Single and Joint Filers With No Dependents", with the IRS.[2] On the

Form 1040EZ, Drilling reported $14,605 as his tax due (before accounting for any

payments of tax and any amounts of tax withheld from his wages). Drilling made

a payment of $475 with the Form 1040EZ. He did not attach a Form W-2, "Wage

and Tax Statement", to the Form 1040EZ. A Form W-2 would have stated how

much was withheld from Drilling's wages for federal income tax.

For the date April 18, 2008, the IRS made an entry on its records[3] for

Drilling's 2007 tax year that there was a "Payment with return". The amount of

---

[2]Drilling contends that the Form 1040EZ was filed timely. The IRS does not take a position on whether the form was timely. As indicated in the text, we find that the form was timely.

[3]Unless otherwise indicated, references to the IRS's "records" are to Form 4340, "Certificate of Assessments, Payments, and Other Specified Matters", also known as an account transcript, and the information reflected in the forms.

**[*4]** this entry is -$475. This entry supports our finding that Drilling made a $475 payment with his Form 1040EZ for 2007. This entry also supports our finding that Drilling filed his return timely.[4]

On June 4, 2008, the IRS sent Drilling a letter stating that it had received his Form 1040EZ for 2007 but that it needed "more information to process the return accurately." In particular, the letter made the following request of Drilling: "Please provide a form with information that supports the wage or withholding entry of $14,130.00 on line 7, Form 1040EZ. It could be Form W-2, Form W-2G (for gambling winnings), or Form 1099-R (for pension income)." The letter supports our finding that Drilling did not attach a Form W-2 to the Form 1040EZ.[5]

---

[4]Our reasoning is as follows. The date of the entry in the IRS's records, April 18, 2008, suggests that the IRS received the Form 1040EZ around April 18, 2008. If the IRS received the Form 1040EZ around April 18, 2008, that suggests that Drilling probably mailed the Form 1040EZ on or before April 15, 2008. If Drilling mailed the return on or before April 15, 2008, then he filed the return timely. A return that is mailed on or before the filing deadline date is deemed filed timely. Sec. 7502; sec. 301.7502-1(a), Proced. & Admin. Regs.

[5]The IRS contends that Drilling did not attach a Form W-2 to the Form 1040EZ. Drilling contends he did attach a Form W-2. Drilling did not testify that he attached a Form W-2 to the Form 1040EZ. Nor did he provide documentary evidence that he attached a Form W-2 to the Form 1040EZ. The Form 1040EZ itself is not in the record. On June 4, 2008, the IRS had to request a Form W-2 from Drilling. This suggests to us that Drilling had not attached a Form W-2 to his Form 1040EZ.

As noted later in this opinion, on April 15, 2011, Drilling's representative

(continued...)

**[*5]** For the date July 14, 2008, the IRS made an entry in its records for Drilling's 2007 tax year. The entry was "Tax return filed". The amount of this entry was $14,605. Another portion of the IRS's records for Drilling's 2007 tax year states:

```
RETURN DUE DATE OR RETURN RECEIVED          Apr. 15, 2008
  DATE (WHICHEVER IS LATER)

PROCESSING DATE                             Jul. 14, 2008
```

The July 14, 2008 entry in the IRS's records of "Tax return filed" and the identification of July 14, 2008, as the "PROCESSING DATE" indicate to us that the IRS finally processed the Form 1040EZ around July 14, 2008. The $14,605 amount associated with the July 14, 2008 entry supports our finding of fact that Drilling had reported $14,605 on the Form 1040EZ as his tax due (before accounting for payments and wage withholding).

Drilling did not respond to the IRS's June 4, 2008 request for his Form W-2.

---

[5](...continued)
faxed the Appeals Office a Form W-2 reflecting that $14,130 was withheld from Drilling's wages for the year 2007. See infra p. 8 (fifth document in table). There is a -$14,130 entry in the IRS's records for the tax year 2007 with the explanation: "W-2 or 1099 withholding". The entry is dated April 15, 2008. Despite this date, we believe this entry was made shortly after April 15, 2011, the day the Appeals Office received Drilling's Form W-2 via fax. The April 15, 2008 date of the entry appears to us to be not the date the entry was made but the date on which (in the IRS's view) Drilling should be credited for the $14,130 amount for certain computational purposes.

**[\*6]** 2.     <u>The IRS's notice to Drilling that it had filed a notice of lien;</u>
     <u>Drilling's initial collection-review hearing before the Appeals Office</u>

On May 11, 2010, the IRS mailed a notice to Drilling that on that day it had filed a notice of lien in Harris County, Texas, to collect income-tax liabilities for the following tax years in the following amounts:

| Year | Amount |
|------|--------|
| 2004 | $236.87 |
| 2005 | 2,144.25 |
| 2007 | 14,736.94 |

The May 11, 2010 notice stated that Drilling could request a collection-review hearing with the Appeals Office.

On June 17, 2010, Drilling mailed the IRS a Form 12153, "Request for a Collection Due Process or Equivalent Hearing", by which he requested a collection-review hearing. As to the "reason" that Drilling "disagree[d] with the filing of the lien", Drilling made the following entries on the form:

- Under the heading "Collection Alternative", Drilling checked both the box for "Installment Agreement" and the box for "Offer in Compromise".

- Under the heading "Lien", Drilling checked the box for "Withdrawal" and explained: "Originally requested offer in compromise then arranged

[*7]  installments which you did not deduct under multiple court ordered payments.  Need Relief."

On April 1, 2011, the Appeals Office had a telephone conference with Drilling and his representative, R. Jeanette Parham.  The settlement officer assigned to the hearing, Alvena Taylor-White, made notes of what transpired during the telephone conference.  The notes reflect that Settlement Officer Taylor-White asked Parham whether Drilling had any issues to raise besides those discussed in the Form 12135; Parham responded that Drilling wished to submit an amended tax return for 2007; Parham stated that Drilling had not been given credit for $14,129 of federal income tax withholding for 2007; Settlement Officer Taylor-White reviewed certain records and agreed that Drilling had not been given credit for $14,129 of federal income tax withholding; Parham stated that she had "no issue" with the tax liabilities for 2004 and 2005; Settlement Officer Taylor-White responded to Drilling's request for a collection alternative by stating that Drilling had not filed his 2006 and 2008 returns; Parham promised to fax returns for 2006 and 2008 and an amended 2007 return; Parham stated that lien withdrawal would facilitate the collection of tax; Settlement Officer Taylor-White explained to Parham the difference between an "IA" [installment agreement] and

**[*8]** an "offer"; and Settlement Officer Taylor-White gave Parham until April 15, 2011, to provide "the addtl info" [i.e., the additional information].

On April 15, 2011, Parham faxed to Settlement Officer Taylor-White a set of documents. Here is a partial list of the documents:

| Date of document | Description of document |
|---|---|
| Apr. 15, 2011 | A Form 656, "Offer in Compromise" |
| Apr. 15, 2011 | A Form 433-A, "Collection Information Statement for Wage Earners and Self-Employed Individuals" |
| None | A Form 1040A, "U.S. Individual Income Tax Return", for the tax year 2007; on line 38, "Federal income tax withheld from Forms W-2 and 1099", is typed the amount $14,130. |
| None | A Form 1040X, "Amended U.S. Individual Income Tax Return", for the tax year 2007; on the line for federal income tax withheld, $0 was typed for the "[o]riginal amount or as previously adjusted" and $14,130 was typed for the "Correct amount". |
| None | A Form W-2, "Wage and Tax Statement", for the tax year 2007 from Oceaneering International Inc.; under "Federal income tax withheld" is the amount $14,130. |
| Apr. 15, 2011 | A Form 1040EZ, "Income Tax Return for Single and Joint Filers With No Dependents", for the tax year 2010 |
| Apr. 15, 2011 | A Form 1040, "U.S. Individual Income Tax Return" for the tax year 2008 |
| None | A Form 1040EZ for tax year 2006 |

| | |
|---|---|
| **[*9]** Aug. 29, 2003 | An order of the County Court at Law of Austin County, Texas, rendered on January 7, 2002, and ratified on August 29, 2003, requiring Drilling to make child-support payments of $250 per month, beginning on January 14, 2002, until his child is 18 years old and requiring Drilling's employers to withhold $250 per month from his earnings for child support |
| Sept. 14, 2004 | An order of the County Court at Law of Austin County, Texas, stating that on August 29, 2003, the court had ordered Drilling to pay child support of $250 per month, beginning January 14, 2002, and that, as of August 31, 2004, Drilling was $4,000 in arrears on child-support payments; the order granted a judgment against Drilling for $4,000 and ordered him to pay the judgment by paying $50 per month beginning October 14, 2004. The order required Drilling to pay "cash medical support" as "additional child support" of $100 per month beginning October 14, 2004, until his child attained the age of 18. The order required Drilling's employers to withhold child support from his earnings. |
| Sept. 27, 2005 | A judgment of the 155th Judicial District Court of Austin County, Texas, in case No. 2001R-0046, suspending a 10-year prison sentence imposed on Drilling for committing an act of arson on September 9, 1999, and placing Drilling in community supervision |
| Sept. 27, 2005 | An amended order of the 155th Judicial District Court of Austin County, Texas, in case No. 2001R-0046, requiring Drilling to make restitution of $105,000, an amount composed of $70,000 restitution to Austin County Farmers Mutual Fire Insurance Co. and $35,000 to Lori Drilling and providing that the "above unpaid total is to be paid in payments of $150.00 each month for restitution to Lori Drilling, until fully paid" to the Community Supervision and Corrections Department and that the first payment would be due on September 1, 2005 |

| | |
|---|---|
| **[*10]** July 27, 2005 | A letter to Drilling from the 155th Judicial District, Community Supervision & Corrections Department, regarding case No. 2001R-0046, stating that Drilling had failed to make payment toward restitution, that he was delinquent $300, and that if he did not make payment by August 4, 2005, he had to appear in court on August 9, 2005 |
| May 5, 2006 | A one-page child-support statement from the State of Texas listing the last 12 payments made by Drilling.  The last payment is a $184.62 payment made on April 24, 2006.  The listed payments were biweekly.  The statement contained the entry "Court ordered payment for May $400.00".  According to the statement there was an arrearage of $2,658.39 in child-support payments and interest. |
| None | An order of the County Court at Law of Austin County, Texas, requiring Drilling to make child-support payments of $859.86 per month, with the first payment on May 1, 2008, for the support of his daughter until the daughter reaches the age of 18 years, and requiring his employers to withhold amounts for child support from his earnings; the order is titled "Order in Suit to Modify Parent-Child Relationship". |
| Dec. 16, 2005 | A lease signed by Drilling and a cotenant allowing Drilling and the cotenant to live in a house in Baytown, Texas, during an initial term of September 1 to October 1, 2005, and then renewable month to month, for a rent of $850 per month |

On April 19, 2011, Settlement Officer Taylor-White made notes about the April 15, 2011 fax.  According to the notes, Settlement Officer Taylor-White forwarded copies of the documents to "MSC/COIC" (apparently the IRS's offer-in-compromise unit).  She forwarded the "tax returns for taxpds [tax periods] 2006, amended 2007, 2008, & 2010" to "Service Ctr to be processed as possible

**[\*11]** duplicates." The IRS's records for the tax year 2007 show that the IRS: (1) credited Drilling with $14,130 for 2007, (2) eliminated all additions to tax for 2007 for failing to pay estimated income tax and income tax, and (3) eliminated Drilling's liability for interest for paying late for 2007. The relevant entries appear to have been made in June 2011.

On April 29, 2011, Drilling submitted to Settlement Officer Taylor-White the Form 656 that he had previously faxed to Settlement Officer Taylor-White on April 15, 2011. On the Form 656, Drilling offered to pay $4,000 in installment payments of $200 per month for 20 months. On the form, Drilling indicated that the $4,000 was offered to satisfy his income-tax liabilities for 2004, 2005, 2006, 2007, 2008, 2009, and 2010. Under the heading "Reason for Offer", Drilling checked the box labeled:

```
Doubt as to Collectibility--I have insufficient assets and income
to pay the full amount.
```

Drilling did not check the box labeled:

```
Exceptional Circumstances (Effective Tax Administration)--I owe
this amount and have sufficient assets to pay the full amount, but
due to my exceptional circumstances, requiring full payment would
cause an economic hardship or would be unfair and inequitable.  I
am submitting a written narrative explaining my circumstances.
```

Also under the heading for "Reason for Offer", the preprinted form contained the following preprinted text:

**[*12]** Explanation of Circumstances (<u>Add additional pages, if needed</u>)
The IRS understands that there are unplanned events or special circumstances, such as serious illness, where paying the full amount or the minimum offer amount might impair your ability to provide for yourself and your family.  If this is the case and you can provide documentation to prove your situation, then your offer may be accepted despite your financial profile.  Describe your situation below and attach appropriate documents to this offer application.

On the blank lines following this preprinted text, Drilling typed these words:

I have been on probation or conditional bond since 2001, and was jailed for some time prior to that.  My ex-wife took all of the assets we had, not once, but three times as (foolish me actually believed that we were getting back together and) I moved back with her twice after the divorce.  That is what ended up causing the criminal charges and jail.  Since I have been on probation and conditional bond, I have been assigned with the task of child support (now more than 800/mo) and restitution to my ex-wife in addition to the court ordered fees associated with probation.  I do not even have access to enough of my funds to live on my own, I rent a portion of a house.  I have included evidence of my monthly necessary expenses and request you consider this offer.

At the same time that he submitted the Form 656 (the offer-in-compromise form), Drilling submitted a collection-information statement that he had previously faxed on April 15, 2011.[6]  In the section of the statement for assets, Drilling stated that he owned the following assets:

---

[6]The parties agree in their briefs that Drilling:  (1) submitted the collection-information statement at the same time he submitted the offer-in-compromise form and (2) submitted the offer-in-compromise form on April 29, 2011.  Thus the parties agree that Drilling submitted the collection-information statement on April 29, 2011.

| [*13]                 Asset | Value | Further explanation |
|---|---|---|
| Cash on hand | $32 | |
| Bank account with JP Morgan Chase | 32 | |
| 401K investment with Wells Fargo Plan Administrator | 16,457 | $18,613 value minus $2,156 loan balance |
| 2010 Ford XTL (vehicle) | -9,437 | $24,788 value minus $34,225 loan balance |
| 2007 Honda H750 (vehicle) | 2,000 | |
| Household furnishings | 1,000 | |
| Sailboat | 1,000 | |
| Total | 11,084 | |

In the section of the form for monthly income and expenses, Drilling stated that his total income was $6,553 and his total living expenses were $5,965, which is a difference of $588. Included in the $5,965 in total living expenses was $1,120 in "Court Ordered Payments".

Drilling's offer-in-compromise was referred to an offer-in-compromise specialist at the IRS. The specialist created workpapers reflecting her determinations regarding the offer-in-compromise. The offer-in-compromise specialist determined that Drilling's net equity in assets was $15,134.40. She set forth her calculations for this figure in a table, the essential elements of which are:

[*14]

| Asset/Equity Table | | | |
|---|---|---|---|
| Asset | Value (post debt) reported by Drilling on Form 656 | Value (post debt) determined by specialist | Reasons given in table for difference between the two values |
| Cash on hand | $32 | -0- | Not explained. |
| Bank account with J P Morgan Chase | 32 | -0- | Not explained. |
| 401K investment with Wells Fargo Plan Administrator | 16,457 | $12,734.40 | The $18,613 value (pre-debt) that was reported by Drilling was multiplied by an 80% quick-sale multiplier. The resulting value, $14,890.40, was then reduced by a $2,156 debt that Drilling had reported. |
| 2010 Ford XTL (vehicle) | -9,437 | -0- | The $24,788 value (pre-debt) that was reported by Drilling was multiplied by an 80% quick-sale multiplier. The resulting value, $19,830.40, was entirely absorbed by a $34,225 debt, bringing the value to $0. |
| 2007 Honda H750 (vehicle) | 2,000 | 1,600.00 | The $2,000 value reported by Drilling was multiplied by an 80% quick-sale multiplier. |
| Household furnishings | 1,000 | -0- | The $1,000 value reported by Drilling was multiplied by an 80% quick-sale multiplier. The resulting value, $800, was entirely absorbed by a $8,370 debt that the specialist apparently was apprised of through sources other than the Form 656. |
| Sailboat | 1,000 | 800.00 | The $1,000 value reported by Drilling was multiplied by an 80% quick-sale multiplier. |
| Total | 11,084 | 15,134.40 | |

The workpapers also provided the calculations underlying the offer-in-compromise specialist's determination that Drilling's monthly income was $6,553 (the same amount he reported on the Form 656) and that his monthly expenses were $6,438 (compared to the $5,965 he reported on the Form 656). Of the $6,438

[*15] in monthly expenses, $1,120 was for "Court Ordered Payments". (This $1,120 was the same amount Drilling reported.). The difference between monthly income and monthly expenses, as determined by the specialist, was $115. The offer-in-compromise specialist determined that Drilling had $13,800 of future income ($115 monthly net income) × (120 months) and $15,134.40 total assets, for a total amount of $28,934.40 (the so-called reasonable collection potential) that he could use to pay his tax liabilities. At the end of the workpapers, the offer-in-compromise specialist wrote:

```
Total Liability:        $12,500.78

Original Offer Amount:  $4,000

Recommendation:         Based upon your future income and equity in
                        assets you have the ability to full pay your
                        liability.
```

On October 27, 2011, the IRS offer-in-compromise group prepared a letter to Drilling stating:

```
        We have investigated your offer dated 04/15/2011 in the
amount of $4,000.00.  A copy of your offer is enclosed.

        We have made a preliminary decision to reject your offer for
the following reason(s):

        Based upon the information you provided, we have determined
that you have the ability to pay your liability in full within the
time provided by law.  Your special circumstances did not warrant
a hardship.  We made this determination on the following
computations:

        Total net equity in assets:                 $15,134.40
        Total ability to pay:                       $15,134.40
        Total balance due:                          $12,500.78
          (Through 05/02/2011)
        Amount you offered:                          $4,000.00
```

**[*16]**       Copies of our worksheets have been enclosed for your review.

        The decision to reject your offer is a preliminary decision made by Collection personnel. Due to the fact that you filed a request for a Collection Due Process (CDP) hearing, we are forwarding your case to Appeals. A final determination on the offer will be issued by Appeals in conjunction with the CDP case.

        Any payments made with your offer will be applied to your tax liability and will not be returned to you.

The letter states that the offer-in-compromise specialist's workpapers were enclosed with it. The IRS[7] contends that it mailed the letter (and, presumably the workpapers) to Drilling. Drilling contends the IRS did not send him the letter or the workpapers.

On December 13, 2011, Settlement Officer Taylor-White made the following notes in the IRS's files about Drilling's offer-in-compromise:

Reviewed rejected offer in compromise:

Brief Bio: tp is unmarried, tp is 49 yrs old, resides in Non-CP state; LRF 30/2010 shows 0 dependent, but F433-A show 1 dependent; OE allowed 2 in h/h

Review of computer transcripts: no open exam/CI audits/csed issues; tp submitted an amended tx return for CDP txpd 2007 since initial analysis; amended tax return reduced tx liab to $0; leaving a credit of $276.65;

Bal due for CDP tx pds (2004/2005) is now $3422.22; with non-CDP tx pds (2006/2008) the total bal due is $6798.19 thru 12/30/11;

Cfink/2848: Jeanette Parham, Level A, caf # 5005-81078R, contact # 979-826-4838

Cause of tax liab: insufficient fit and/or ftp est tx pymts
Compliance: tp is in compliant [sic] w/filing requirements; LRF 201012
Inoles: no x-ref #
Irptrl: 2010 Irptrl show $81,441 medicare wages

---

[7]Here and elsewhere, we refer to the Commissioner of Internal Revenue, respondent in this case, as "the IRS".

[*17] Previous St: 24; Current St: 71
Liens: lien has been filed on CDP tx pds
Basis: Tp submitted a DATC Offer to compromise single tx liab for tx pd(s) 30/2004, 2005, 2006, 2007, 2008, 2009, 2010; per OE's wksheet tp owed for only 2004, 05, 06, 07, 08; tx liab was $12,500.78
Current balance due: $6788.76 thru 11/16/11
Terms: tp offered to pay $4000 Short-Term Deferred Payment; $200 submitted w/ offer; bal of $3800 payable @ $200 on the 5th of each month for a total of 20 months.
Application Fee: tp submitted $150 application fee, funds applied w/ DPC 33 to txpd 30/2004
Tipra: tp provided $200 Tipra pymt, applied w/ DPC 34 to txpd 200412

Reason for Rejection: Rejection based on RCP from NRE in assets and future income.

AET: net eqty in assets: $15,134.40
IET: $115 in discretionary income
COIC RCP: $28,934.40

Due to CDP, OE did not mail a formal rejection of offer to tp; rejection was subject to Appeals review; no F13711 provided by tp/poa listing appeal issues.

Appeals Position:

I reviewed the OE's case history & worksheets and concur with the rejection recommendation; OE worked the case under Streamlined Criteria; per OE there were no significant discrepancies between tp's claimed figures on the F433-A & internal sources; so, OE allowed tp's claimed figures:

Plan of action: attempt to contact tp via telephone to discuss an IA as a possible collection alternative.

On December 13, 2011, Settlement Officer Taylor-White prepared a letter to

Drilling.  The letter said:

I have reviewed the case file and the information you previously submitted to the Offer Examiner.

The Offer Examiner's preliminary decision was to reject your offer based on your Reasonable Collection Potential.  I've enclosed a copy of the Offer's worksheets for your review.

Review the worksheet and provide the Form 13711, addressing the disagreed items.  Provide documentation supporting your position on the items that you do not agree with.

Appeals [sic] preliminary determination is to sustain the rejection of your offer.

**[\*18]** `My review of the Offer Examiner's worksheet shows that you were`
`practically allowed all claimed expenses on your Form 433-A.`

`Please provide the above information by December 29, 2011.`
`Note: My preliminary determination is to sustain the filed Notice`
`of Federal Tax Lien due to failure to provide documentation that`
`with drawing [sic] the lien will facilitate the collection of`
`taxes.  If you wish to provide additional information for me to`
`consider a lien withdrawal, please do so by the above deadline`
`date.`

`FYI: The criteria for a lien withdrawal under a Direct Debit`
`Installment Agreement (DDIA):`

`Eligibility Requirements for a DDIA Lien Withdrawal:`

  - `The current amount you owe must be $25,000 or less`

  - `If you owe more than $25,000, you may pay down the`
    `balance to $25,000 prior to requesting the lien`
    `withdrawal to be eligible`

  - `Your Direct Debit Installment Agreement must full pay`
    `the amount you owe within 60 months or before the`
    `Collection Statute expires, whichever is earlier`

  - `You must be in full compliance with other filing and`
    `payment requirements`

The IRS contends that it sent a copy of the letter to Drilling and another copy to

Parham.  The IRS does not take a position on when it sent the letter, which is

dated December 13, 2011.  Settlement Officer Taylor-White's notes say she

mailed the letter on December 15, 2011.  Drilling contends that although the letter

was dated December 13, 2011, it was not mailed until December 20, 2011.

Drilling also contends that neither he nor Parham received the letter until after the

December 29, 2011 response date given by the letter and that when they did finally

receive the letter, the offer-in-compromise specialist's workpapers were not

enclosed.  We need not determine when the IRS sent the letter, or whether it

[*19] enclosed the workpapers with the letter, because the Appeals Office provided the workpapers to Drilling in 2013 during the supplemental hearing it held pursuant to the remand by this Court.

On January 11, 2012, Parham left a voice message with Settlement Officer Taylor-White stating that she had just recently received the letter dated December 13, 2011, and that she had never received the workpapers concerning the IRS's review of Drilling's offer-in-compromise. Settlement Officer Taylor-White wrote in her notes: "[S]he left voice messg stating that she recd my addtl info ltr the 1st of the yr & the deadline to respond was 12/29/11; she also stated that the OE's wksheets were not sent as stated in my ltr." Her notes indicate that she tried unsuccessfully to telephone Parham twice but do not indicate that she sent Parham another copy of the offer-in-compromise specialist's workpapers.

On January 31, 2012, the Appeals Office issued the initial notice of determination. The notice stated that because Drilling had not responded to the December 13, 2012 letter by the deadline imposed by the letter (December 29, 2011), the Appeals Office's preliminary decision to reject the offer had become final. The notice also stated that: (1) Drilling had disagreed with the amount of his 2007 tax liability because he was not given credit for federal income tax withholding for the year, (2) a review of the IRS records showed that Drilling had

[*20] been given credit for the withholdings, and (3) there was no longer a balance due for 2007.  The Appeals Office sustained the filing of the notice of lien.

On February 3, 2012, the IRS contends, its October 27, 2011 letter to Drilling (which was purportedly accompanied by a copy of the offer-in-compromise specialist's workpapers) was returned to it by the U.S. Postal Service with a note stating that it had been refused by the recipient.  Drilling contends that the IRS never sent the letter to him.  We need not determine whether the IRS sent the October 27, 2011 letter to Drilling because the Appeals Office gave Drilling a copy of the offer-in-compromise specialists's workpapers in 2013 when it held the supplemental hearing pursuant to a remand by this Court.

3. Drilling's petition, the Court's remand order, and the supplemental collection-review hearing

On March 1, 2012, Drilling filed the petition challenging the January 31, 2012 notice of determination.  In the petition, Drilling alleged that Parham never received the workpapers.  In its entirety the petition states:

> Taxpayer met criteria to have offer in compromise accepted. IRS failed to provide documentation with notice of time to comment and did not provide notice of time to comment timely.  By the time Taxpayer's representative received the incomplete notice (notice without worksheet that it alleged was included) the time to respond had elapsed.  To this day, other than the notice declining the offer in compromise, Taxpayer has received no explanation of the denial.
>
> Taxpayer submitted a schedule showing that the expenses incurred for necessaries and under other government withholding orders consumed all of the income of taxpayer.  For this reason,

[*21] the $200.00 per month to pay all taxes without penalties is reasonable.

On March 7, 2013, the IRS filed a motion to remand the case. In the motion the IRS stated: "While the respondent [the IRS] does not admit that the workpapers in question were not in fact sent to the petitioner, the administrative file does not definitely establish that the workpapers were re-mailed to the petitioner after he requested same through his attorney." The motion continued: "Accordingly, respondent will provide a copy of the workpapers to petitioner's counsel and requests that the case be remanded to the settlement officer to allow the petitioner to address the issues raised in the workpapers." The motion advised that Drilling had no objection to the granting of the motion.

On March 7, 2013, the Court granted the motion to remand. It ordered the case "remanded to respondent's Office of Appeals for the purpose of affording petitioner an administrative hearing pursuant to I.R.C. section 6330."

On April 16, 2013, Settlement Officer Linda A. Hartfiel in the Appeals Office sent a letter to Drilling advising him that she had been assigned his collection-review case on remand from the Tax Court. Settlement Officer Hartfiel enclosed with the letter: (1) the October 27, 2011 letter from the IRS offer-in-compromise group and (2) the workpapers that had been created by the offer-in-compromise specialist.

**[\*22]** On April 30, 2013, Settlement Officer Hartfiel had a face-to-face conference with Parham. Settlement Officer Hartfiel made the following notes regarding the conference:

> Met with POA at the appointed time to discuss remanded CDP LN case. She received the package I mailed out 4/16/2013 that contained the preliminary determination from MOIC dated 10/27/2011. Issues: Discussed IET/AET & POA wants tp's financial condition at the time the tax became due considered, not current.
>
>       \*        \*        \*        \*        \*        \*        \*
>
> I explained the following to the POA:
>
> 1. DATC OIC's are calculated based on current ability to pay, not past. That is the law. We reviewed the AET and POA disputed the fact that the Service would be entitled [sic] to the tps 401 K. I advised even if we took that off the AET, the tp can full pay the liability. POA admitted the tp is making decent money, but was adamant that the offer be calculated on when he was making minimum wage. I told her that was not possible, the law is clear, current income/assets are what are considered in this type of offer. I advised the POA that agreed with the 10/27/2011 preliminary decision and the offer is rejected.
>
> 2. I suggested the tp enter into an guaranteed/streamline installment agreement to full pay the liability. Payments could be as low as $70 per month. POA said that is not possible because she doesn't think the tp owes the amount I told her $4204.06. She thinks the Service has not given the tp credit for all of his payments and has continued to charge him too much interest. I provided her with transcripts for 2004-2012 which included non CDP years, but we reviewed only the CDP years.
>
> 3. POA stated they filed the offer because the SO said she had to have it to not file the NFTL. This is not correct, because the tp got into Appeals after the lien was filed. The filing gave him CDP rights. The POA had her facts confused.
>
> 4. POA disputed the amount on the lien for 2004. I explained the $236.87 was the UBA and what that meant. I reviewed the transcript with her item by item, pulled INTSTB, added up the interest and penalty charges and repeatedly tried to explain how balances are paid.
>
> 5. POA is convinced that the Service is playing a shell game on the taxpayer and has charged him too much interest. I asked what that meant and she said when the taxpayer only owes $238.87 and the Service collected more than that amount, the taxpayer can't win. I explained UBA again as well as accrued penalty and interest.

**[\*23]** 6. POA staed [sic] they filed the offer to pay the tax and have penalty and interest abated. I explained that is not the purpose of a DATC offer which settles all or nothing. I explained interest is required to be charged by law with the exception of erroneous refunds and ministerial acts. POA said there were errors made. I defined ministerial act as more than a mere mistake, it must be egregious on the Service's part and is difficult to qualify for. I concluded that this taxpayer doesn't have any ministerial reason for interest abatement.

7. I asked what is penalty reasonable cause and she said you shouldn't kick a dog when its [sic] down and then added that he couldn't pay the taxes. I told her neither reasons fell under Reasonable Cause. But if she wanted to provide me with a written statement, I would consider it. She said she has never been asked for that before. I told her it was up to her to provide the information or not.

8. After much discussion back and forth where I tried to relay the various charges and credits, I asked the POA what she wanted. She said she wanted me to tell her where to find the factors for interest and penalty calculations that the Service used. I told her instructions to 1040 and Pub 17 are useful in how the charges are assessed. As far as the factors, use irs.gov search iengine [sic] to see what she could find. I explained I used the official transcripts to determine interest and penalty charges and don't need factors to do so. POA then asked about credit interest on the credit periods and wanted me to calculate credit interest for the taxpayer. I told her that first, he may or may not be entititled [sic] to it and second I didn't know how to calculate this amount as it would be automatically generated if warranted.

9. Finally, we agreed that I would telephone POA 5/6/2013 @ 9:00AM to see if she is in agreement with the interest charges on 2004. If she is she thinks an IA may be agreeable. If not, I will explain she can file a 843 claim outside the scope of this appeal.

10. Besides abatement POA also brought up the new issue that an OIC was filed 5/2006. She showed me her copy of the F656 and said she never heard anything about the offer. I reviewed the transcripts and found no offer pending around the same time, but did see request for IA. I told her the OIC was really an IA request. POA said they told her to pay $43 and they did on the offer. I told her $43 was an IA fee and that the offer was an IA request.

11. As all issues were addressed, the conference was closed.

During the face-to-face conference, Settlement Officer Hartfiel asked Parham for a written statement from Drilling explaining why the Appeals Office should abate

[*24] penalties and interest.[8]  However, Drilling did not submit a written statement

---

[8]Drilling disputes that Settlement Officer Hartfiel made this request.  The evidence supports the proposition that Settlement Officer Hartfiel made such a request.  First, Settlement Officer Hartfiel's notes quoted above (point 7) state: "[I]f she wanted to provide me with a written statement, I would consider it.  She said she has never been asked for that before.  I told her it was up to her to provide the information or not."  Furthermore, at trial Settlement Officer Hartfiel testified:

```
We discussed penalty and interest, and I told Ms. Parham if--you
know, if she felt strongly about that, while interest is required
by law, if she wanted to submit a written statement for reasonable
cause of abatement of penalty and interest, you know, I would
certainly consider a written statement, but that a penalty
abatement request needed to be in writing to me.  And she took
that under advisement.
```

In its opening brief, the IRS proposed the following finding of fact:

```
During the supplemental collection due process hearing Settlement
Officer Hartfiel requested that petitioner's counsel submit a
written statement concerning the petitioner's request that
interest and penalties be abated.
```

In support of this proposed finding of fact, the IRS cites Settlement Officer Hartfiel's notes, her testimony, and other portions of the record.  In his answering brief, Drilling objects to the proposed finding of fact, giving the following reason:

```
With the exception of documents expressly prepared for litigation
and self serving testimony, no documentation or letter to
Petitioner requested additional information related to the
abatement of interest and penalties.  An offer in compromise, by
definition, is to compromise the taxpayer's liability without
regard to whether it is original tax or penalties and interest.
Petitioner submitted an offer in compromise which by its nature
requests that part of the liability as calculated by the Internal
Revenue Service be abated in exchange for payment.
```

Drilling's objection lacks merit.  Both Settlement Officer Hartfiel's notes and her testimony make clear that the request for a written statement was not a written request.  It is therefore irrelevant to the validity of the proposed finding of fact that "no documentation or letter" contained this request.  Furthermore, Drilling's objection that his offer-in-compromise included a claim for abatement of interest

(continued...)

**[\*25]** concerning the abatement of interest and penalties during the consideration

of the supplemental collection due process hearing.[9]

On May 6, 2013, Settlement Officer Hartfiel made the following notes in

her files:

```
Checked AOIC for prior offers referencing the one the poa said was
sent in 5/2006.  No record of any prior offer, only the current
one that was rejected.  Checked AMS, determining ACS levied & then
tp wanted $50 IA around 5/4/2006 which is about the same time the
POA says files the offer. As I told the POA during the conference,
POA offer was an IA request.  The initial IA couldn't be granted
because the tp hadn't file [sic] all of his returns.
```

On May 7, 2013, Settlement Office Hartfiel spoke with Parham on the

telephone.  Hartfiel made the following notes in her file about the conversation:

```
We discussed the first offer that I agreed with her turned out to
be an IA that tp defaulted on when he didn't file his returns.  I
explained again why the current OIC couldn't be recommended for
```

_____

[8](...continued)
and penalties does not respond to the IRS's proposed finding of fact, which
concerns what Settlement Officer Hartfiel asked of Drilling at the supplemental
hearing, not the nature of Drilling's offer-in-compromise.  Drilling's objection is
evasive and nonresponsive.

[9]Drilling disputes this fact on the ground that his offer-in-compromise form,
which he characterizes as an "exceptional circumstances statement", constituted a
written statement concerning the abatement of interest and penalties.  We disagree.
First, Drilling faxed his offer-in-compromise form on April 15, 2011.  His form
could not have been a response to the Appeals Office's request for a written
statement, made during the supplemental hearing on April 30, 2013.  Second,
Drilling's offer-in-compromise form explained why he could not pay the penalties
and other liabilities, not why he was not liable in the first place.  Both in timing
and substance, the offer-in-compromise form is not a response to Settlement
Officer Hartfiel's request for a written statement concerning the abatement of
interest and penalties.

**[*26]** accepted Assets + income are greater than balance due & even if all assets are discounted (401K--mainly), the tp can pay $115 per month which would full pay the $4K+ balance due within the CSEd. I asked the POA if she wanted an IA and her ressponse [sic] was she doesn't believe the liabiity [sic] is correct because the transcripts are wrong. She started discussing 2003 which is not part of the CDP and brought up the fact that her actuarial tables differed from the transcripts. I told her those transcripts are what I rely on and if she felt there were incorrect penalty or interest charges or payment dates, she could file a Form 843 Claim for Refund through normal channels. The POA declined the IA and I told her that I would issue the supplemental NOD and since there were no other issues, the conference was concluded.

On May 7, 2013, Parham sent a letter to the counsel for the IRS. The letter stated:

This letter is written exclusively for the purposes of settlement negotiations, with all of the rights and privileges attached thereto.

I had such great hopes for the administrative hearing, but to no avail. Although Ms. Hartfiel's title is Settlement Officer, settlement as it is generally defined in legal venues did not appear to be her goal.

I understand that we are tasked with a Joint Status Report on or before May 28, 2013. I am literally out of the continental US until May 22, 2013 (a day that I will probably spend reacquiring pets from boarding facilities, and unpacking). I am, by notice to all courts but this one (which I will try to remedy before I leave) on vacation from May 6 to May 26, 2013. This trip has been planned for more than a year. I did not expect not to reach a mutual agreement on this one.

It is for that reason, I am providing you this letter to attempt to discuss some of the issues here that the appeals officer was not willing to discuss.

Some background:

In 2006, Mr. Drilling received a notice of intent to levy with regard to 2003, 2004 and 2005. In response, and because of the legal issues he had been involved in for some years, he filed an offer in compromise. Rather than accepting the offer, the IRS set up a payment plan (you will see notations of that in the account transcripts). The IRS was to draft the monthly installments of $43.00 and change.

At the time of the installment plan, the intent to levy showed the following tax liabilities: 2003--$836.77 (including penalty and interest to 11-06-2006; 2004--$2386.90 (including

[*27] penalty and interest to 11-6-2006) and 2005--$2172.23 (including penalties and interest as of 11-06-2006)

On May 3, 2006, Mr. Drilling filed the First Offer in Compromise offering 1210.00 over five years at the rate of $10.00 per month. Transcripts report this as a payment agreement, although no acknowledgment was ever sent out by the IRS. Interest and penalties continued to accrue.

When the second lien was noticed, and the Administrative Due Process hearing was held with Ms. Taylor-White, she indicated that the installment plan had been terminated for non-pay. The non-pay does not now appear to be true. What does appear to be true is that none of the payments were timely credited against 2004 or 2005. Tax year 2003 went from a collection amount of $836.77 to an overpayment of $1737.58 (with no interest credit). This amount was applied, in lump sum to 2004 on February 27, 2009 (two years after alleging that payments had not been under the payment agreement. During those two years, 2004 was charged with both interest and late payment penalties monthly on amounts that were sitting in 2003, because the IRS had applied more payments than were necessary to pay 2003. Mr. Drilling is not in control of how the IRS allocates payments he makes under agreements, the accounting is strictly in the hands of the IRS.

Moving on. When a notice of Federal Tax Lien Filing was received from a. your office in dated [sic] May 11, 2010, the lien indicated the following amounts:

a. 2004--$236.87;
b. 2005--$2144.25 and
c. 2007--$147363.94. [sic]

Following the request for administrative hearing and filing the Offer, this grew by:

a. 2004--$388.00;
b. 2005--358.81,
c. 2006--1467.48
d. 2007--3463.34, and
e. 2008--$1158.66.

Of these amounts, 1660.33 were penalties and interest on 2004, 2005, 2006 and 2008 just since the notice of lien. Looking at just 2004, 2005, 2006 and 2008 the total requested at the time of the second OIC was $ 10637.40. Mr. Drilling offered $4000.00 at the rate of $200.00 per month, and paid the initial fee of $150.00, then set out making payments. Initial payments were not made because we did not know to where or whom until the Ms. Taylor-White provided guidance on this matter, well after the initial administrative due process hearing.

The 2007 year has not been mentioned in this because it was actually more than fully paid. In fact, it had a credit of $276.65 (again on which no interest was accrued or paid). The IRS had failed to post his withheld tax to the return.

**[*28]** Our position:

The IRS Fresh Start Installment Agreement publication indicates that the payment plan (at the time the second OIC was submitted) had to be repaid within 5 years. Collection Process Publication 594 provides that an Offer in Compromise may be requested if "you cant's [sic] pay the amount you owe in full or through installments." Publication 594 also provides that Form 656 is appropriate if you are unable to pay the amount due, have an economic hardship, or other special circumstances that would cause paying the amount due to be unjust. The offer in compromise made by Mr. Drilling never requested a reduction in taxes only the penalties and interest because he was having his earnings claimed by so many government entities. We provided, and the IRS has accepted the expenses and income of Mr. Drilling at the time of submission that showed his left over income for payment to the IRS was $115.00 per month. A five year payout on $10637.40 would be $354.58 per month, more than three times the amount available. This does not include current taxes that have yet to be reported. Moreover, Mr. Drilling were [sic] able to show the IRS that the debts of Mr. Drilling included collections by the State of Texas that, if unmade, could affect his liberty (a criminal restitution order collected by Probation), and child support garnishments of more than $1000.00 / month, another debt that if unpaid could affect his liberty. Without his liberty, Mr. Drilling would be unable to pay the IRS. Mr. Drilling has one and only one asset of any size which is a qualified retirement plan. Even Form 656 Booklet warns of future tax implications if a 401K is used to pay past taxes, and to contact the IRS or a tax advisor before doing so. Yet, this asset is pointed to as a means for Mr. Drilling to pay back taxes by Ms. Hartfiel. Generally, retirement plans are not seizable according to Publication 594, nor is there any guarantee he is vested or has the right to make a loan or distribution. It is for these reasons that Mr. Drilling made an Offer in Compromise, not a request for a payment plan.

I have included the schedules prepared by the IRS as Schedule Set C for your easy review. A couple of notes on the schedules: 1) as to the retirement fund, 20% backup withholding alone is in excess of $2800.00 plus the $2165.00 encumbrance, and 2) the claim that Mr. Drilling claimed his entire monthly income as home and maintenance expense is a typographical error. The calculation indicates a 10 year payout at $115.00 per month, while the offer in compromise is limited to 24 months and the payment agreement is limited to 60 months. Even then, with 10 additional years of late payment and interest accruals, the accounts would not be paid at the end of a ten year period either.

Form Booklet 656 Offer in Compromise sets out that a Offer which is made to repay over time, must be payable within 24 months. Mr. Drilling promised to pay (and in fact did pay) $200 per month until he had paid $4000.00. In fact, when added to other payments which we will discuss in a moment, he paid $5200.00, mostly at the rate of $200 per month. The exceptions to this was when Ms. Taylor White told Mr. Drilling that he had to come up with $500 by a date certain for her to consider the OIC, and the $700.00 he paid to finish paying the taxes on the 2010 tax

**[\*29]** return. This amount was diverted by Ms. Taylor-White to the 2004 return (it should not have been, but that is a later subject).

Ms. Taylor-White and Ms. Hartfiel have both determined that the information provided shows that Mr. Drilling can pay the delinquency in full within a 60 month period from the date of the a [sic] payment plan. The problem is that payment plan is an extension of the two year offer in compromise payments so they are really collecting over 7 years not 5. Regardless, I obviously disagree with their math.

Ms. Hartfiel was of the opinion that penalties and interest would not be compromised yet, again in Booklet 656 it states, "If your offer is in default, all compromised tax debts, including penalties and interest, will be reinstated." If it is reinstated, it had to be compromised at the time the offer was accepted.

I am providing you, with this letter, two sets of schedules.

Schedule Set A is a correction of the calculations in the transcripts provided by Ms. Hartfiel. The calculation corrects the interest calculations and the late payment penalty by applying the payments only to a year that has a tax liability balance due and carries any credit from a prior year over to the next year with a liability balance due in the month that it becomes an overpayment. This means that the recalculation ceases applying payments to a particular tax year when the liability is paid in full and moves any overpayment to the next year with a liability. In doing this only 2005, 2008 and 2010 (which was an engineered liability I will explain in a few minutes) have assessments still due. The 2008 year was not part of the lien or the original offer, but was added by Ms. Taylor-White, and 2010 was created by Ms. Taylor-White. The Total of the three is $3822.04 with interest and penalties accrued to June 1, 2013. Ms. Hartfiel seems to feel that she is being gracious is [sic] offering Mr. Drilling an opportunity to make 60 payments of $70, a total of $4200.00 as of May, 2013 (with increasing interest and penalties). In other words, pay $70.00 per month for five more years only to have the problem continuing.

Schedule Set B takes one extra step. It reverses the $700.00 that Mr. Drilling paid for 2010 that Ms. Taylor-White applied to 2004, and like set A stops applying payments to the tax year when all liabilities have been paid, and carries overpayments forward or back (based on the IRS transcripts provided) at the time the overpayment is apparent. Under this scenario, Mr. Drilling only has two tax years with outstanding liabilities, 2005 and 2008, for a total of $ 3755.78. The act of applying the $700.00 to year for which it was intended makes a difference of $66.26 in penalties and interest.

There would be additional reduction in penalty and interest in 2004 if the $1737.58 could be applied as received instead of a lump sum two years later, which would ripple through and reduce future years penalties and interest, but that is another story, and I do not have those transcripts to obtain the appropriate date for application to 2004.

**[\*30]** Of all of these amounts, $2168.72 represents penalties and interest on 2004, 2005, 2006 and 2008 since the notice of lien was sent out by the IRS. If this amount were eliminated, as a result of the Offer in Compromise, Mr. Drilling would be faced with only $1653.32 under the Set A scenario, or $1587.06 under the Set B scenario.

Without regard to all of this, at this point, Mr. Drilling has physically paid $63838.62 against a pure tax debt of $63159.00 for the years 2004-2011. He is not a tax deadbeat, just a man that had the government taking so much of his money he had nothing to live on for a few years.

Requested Resolution

I really would like to put this to rest, but I cannot recommend to my client that he agree to pay more than he currently owes in taxes penalties and interest to settle this. Is there anyway we can call it even, or settle it for the $1587.06? The Settlement Officer would not hear of this offer, however, I have negotiated settlement agreements with counsel before, and it is not like I do not have the calculations to back up my offer.

The counsel for the IRS sent Parham's letter of May 7, 2013, to Settlement Officer Hartfiel, who read the letter and made the following notes in her files:

I reviewed the information Parhan [sic] sent to Mora dated 5/7/13:

POA disputes the equity in the 401K. As I've mentioned before, even if the 401K amount is reduced to zero, tp can full pay thru $115 per month.

I reviewed the package of information where POA makes her argument that the tp has already paid in a lot of $$, the amount could be less if

1.  Schedule Set A is used to correct the calculations in the TDS transcripts I provided. the calcualtions [sic] correct interest calculations and the late payment penalty by applying the payments only to a year that has taxes owed and carries any credit from a prior year over to the next year with a liability balance due in the month that it becomes an overpayment.  To the POA this means that the recalculation ceases applying payments to a particular year when the liability is paid in full and moves any overpayment to the next year with a liability.

2.  Schedule B takes one extra step.  It reversed the $700 that Mr Drilling paid for 2010 that the prior CDP SO applied to 2004 and like Set A stops applying payments to the tax year when all liablities [sic] have been paid and carries overpayments forward or back (based on transcripts provided) at the time the overpayment is apparent.. [sic]  Using Schedule B POA states leaves tp with only 2 tax years with outstanding liabilities 2005

**[\*31]** and 2008, for total of $3,755.78. The act of applying the $700 to the year it was intended (2010?) makes a difference of $66.26 in P & I.

There would be additional reduction in P & I in 2004 if the $1737.58 could be applied as received instead of a lump sum two years later which would ripple through and reduce future years P & I. But that is another story and she states she doesn't have the transcripts to to [sic] obtain the appropriate date for application to 2004.

Of all of these amounts $2168.72 represents P & I on 2004 2005 2006 & 2008 since the notice of lien was sent out by IRS. If this amount was eliminated, as a result of the OIC, the tp would be faced with only $1653.32 under Set A or $1587.06 under Set B.

POA adds that tp has paid $63838.62 against pure tax debt of $63,159 for 2004-2011. He is not a tax deadbeat, just a man that had the government taking so much of his $$ that he had nothing to live on for a few years.

3. POA's requested resolution, while she would like to put this to rest, but she cannot recoomend [sic] to the tp that he agree to pay more than he currently owes in taxes, penalties & interest to settle this. Is there anyway we can call it even, or settle for the $1,587.06 She concludes by saying the SO (me) would not hear of this offer, however, POA states she has negotiated settlement agreements with counsel before and it is not like I do not have the calculations to back up my her offer.

While this is the first time I've seen or heard this specific amount $1587.06, the POA is correct it is not an agreeable amount.

4. I completed Decision IA without consdering [sic] the 3 years of credits $881.53 on 2004, $2.57 on 2006 & $276.65 on 2007 to toal [sic] $1160.75 tp will full pay @ $115 per month on 9/28/2017. With the credit, I estimated the taxes would be paid 10 months earlier or 11/28/2016. In fact Decision IA shows $60 per month would full pay the liability. See the Decision IA in the case file.

5. I checked the $700 pymt POA states was intended to 2010, on RTR, it is a money order and no designation is made on the payment.

6. I checked the CDP carats and the prior SO noted in her 4/1/2011, tp did not have any issue with the tax liability on 2004 and 2005. For 2007, the SO gave the tp an opportunity to file an amended return, which they did and the tax was reduced as reflected on IDRS with current $276.56- credit. This was due to Math Error 582 where tp didn't include Form W2 or other document for FIT claimed. Since the CDP periods are all self filed and tp filed amended return for 2007, the taxpayer is precluded from raising the liability as an issue in this CDP hearing.

7. Regarding the POA's now raising the liabilility [sic] as an issue, the CDP years are all self filed returns. 2007 was adjusted

**[\*32]** based on the amended return filed by the tp because this year had Math Error 582 meaning the tp did not include the W2 or other document claiming FIT with the tax return.
The IRM states: 8.22.5.4.2.1 (03-29-2012) Valid Assessment - Self Filed Return
(1) Where assessment of the tax is based on a self-filed return, it is sufficient to rely on the TC 150 on IDRS command code TXMOD to confirm the validity of the assessment.
(2) If the taxpayer disputes the liability on the self filed return, see IRM 8.22.8.7, Liability Issues and Relief from Liability, Self-Filed Returns.

Furthermore, 8.22.8.7 (03-29-2012) Self-Filed Returns
(1) If a taxpayers disputes the liability on a self-filed return, provide them with a deadline of at least 21 calendar days to file an amended return with you.

(2) If the taxpayer fails to amend the return after disputing the liability, note the opportunity offered to address liability in the attachment to the determination or decision letter.

(3) Appeals can reduce the liability on a self-filed return. There is no statute of limitations for requesting abatement but there is Refund Statute Expiration Date for credits and refunds in IRC 6511.

My determination based on the analysis above is that an offer in compromise cannot be recommended for acceptance because he can full pay, the IA was declined, the new issues of the liability are precluded because the taxpayer was provided a prior opportunity 4/1/2011 to raise the liability as an issue.

On July 29, 2013, the Appeals Office issued a supplemental notice of determination sustaining the filing of the notice of lien. Attached to the supplemental notice was the following text:

| Attachment to Supplemental Notice of Determination | | |
|---|---|---|
| Type of Tax | Tax Period | CDP Notice Date |
| 1040 | 12/31/2004 | 06/17/2010 |
| 1040 | 12/31/2005 | 06/17/2010 |
| 1040 | 12/31/2007 | 06/17/2010 |
| Total owed through 07/15/2013 | $3,151.14 | |

**[\*33]** <u>Summary and Recommendation</u>

The case was remanded by the Court to provide the taxpayer with the offer in compromise calculations used by the Memphis Campus Settlement Officer to reject the taxpayer's $4,000.00 offer in compromise submitted within the Collection Due Process system. The terms were $200 a month for 20 months for income tax years 12/2004, 12/2005, 12/2006, 12/2007, 12/2008 and 12/2010.

The taxpayer timely filed a Collection Due Process (CDP) Hearing Request under Internal Revenue Code (IRC) Section 6320, in response to the Letter 3172, Notice of Federal Tax Lien Filing and Your Right to a Hearing.  The Automated Collection System issued the notice on May 11, 2010 by Certified Mail, Return Receipt Requested.  The last day to timely file an appeal was June 17, 2012. The taxpayer's appeal on Form 12153 was postmarked June 17, 2012 and received on June 21, 2012. Therefore, the protest was timely.

While the taxpayer disagreed with the filing of the Notice of Federal Tax Lien, no collection alternative such as a bond was proposed.  Instead, the taxpayer submitted an offer in compromise for $4,000.00 on April 15, 2011.  If the offer was accepted, the Notice of Federal Tax Lien would be automatically released after all of the payment terms were met.

However, the preliminary evaluation revealed that the offer in compromise should be rejected because the taxpayer could full pay the taxes.  The Notice of Determination stating this was dated January 31, 2012.

The taxpayer timely filed his petition taking his case to Tax Court because he never received the preliminary offer in compromise calculations.  Respondent agreed to remand the case to Appeals in order to assure that the taxpayer received the workpapers in question as well as provide him the opportunity to discuss them with a Settlement Officer.

The Tax Court granted respondent's motion and ordered that the taxpayer would receive a supplemental hearing.  The case was remanded to Houston Appeals.

Houston Appeals conducted the supplemental hearing on April 30, 2013 in a face to face meeting at the Houston Appeals Office with Representative, R. Jeanette Parhan [sic].  As a follow up, another conference was held by telephone on May 7, 2013.  It was determined that the taxpayer's original offer amount of $4,000 was correctly rejected.

The taxpayer can full pay the liability; therefore the offer in compromise is rejected.  The taxpayer was offered the collection alternative of an installment agreement, but declined.

For the CDP periods above, the taxpayer owes $3,151.14 figured through July 15, 2013.  This doesn't take into account the $881.53

[*34] and $276.65 credits on the December 31, 2005[10] and December 31, 2007 periods, respectively.  There are other balances owing of $2,236.40 figured through July 15, 2013 that are not part of this CDP case.

Brief Background

The Memphis, TN Campus Appeals Unit was assigned the original Notice of Federal Tax Lien file.  The Settlement Officer held the hearing on April 1, 2011. On April 15, 2011, the Form 656, Offer in Compromise as well as supporting documents were faxed to the Settlement Officer.

On October 27, 2011, the Centralized Offer in Compromise Group sent the taxpayer information that they had preliminarily determined that the offer should be rejected.  Then, the Memphis Settlement Officer reviewed the preliminary determination on November 16, 2011.

Her evaluation was that the preliminary decision was correct and that the offer should be rejected.  The Settlement Officer communicated the rejection in a letter to the taxpayer and representative on December 13, 2011.  Copies of the workpapers prepared by the Centralized Offer in Compromise Unit were included in the mailing.

However, after several attempted telephone contacts between the Settlement Officer and Representative, R. Jeanette Parhan [sic] were unsuccessful, the Notice of Determination sustaining the Notice of Federal Tax Lien and rejecting the $4,000 offer in compromise was sent on January 31, 2012.  As a result, the taxpayer timely filed his petition to Tax Court where the case was remanded on respondent's motion.

Settlement Officer, Linda Hartfiel, was assigned the remanded case on April 12, 2013.  The court required that the petitioner be provided with a new hearing to discuss the issues raised in their Collection Due Process proceeding.

In particular, the petitioner was to be provided a copy of the work papers used by the initial Settlement Officer in Memphis. These documents were used to determine that the taxpayer was not entitled to settle his income tax debt through an offer in compromise as requested during the initial Collection Due Process hearing.

Then, the petitioner was to be provided with an opportunity to discuss the matter raised in the work papers.  The deadline for this action was May 7, 2013.

---

[10]The settlement officer testified that 2005 was an error and the correct year was 2004.  Drilling does not challenge the supplemental determination on the basis of this error.

**[\*35]** When Ms. Hartfiel was unable to reach the representative by telephone, she mailed the petitioner and representative a letter on April 15, 2013. The correspondence contained the October 27, 2011 preliminary determination and workpapers as required by the court. In addition, three possible hearing dates were provided to further assist the taxpayer in understanding why the offer in compromise was rejected.

After leaving daily voice mail messages with the representative, Ms. Parhan [sic] returned Ms. Hartfiel's call on April 23, 2013. The April 30, 2013 in person meeting was agreed upon for noon.

The hearing took place as scheduled. The October 27, 2013 offer in compromise charts were discussed in detail. As the representative provided no new information to change the outcome of the offer in compromise figures, the determination was that the offer in compromise was correctly rejected. In addition, the Notice of Federal Tax Lien was sustained.

Legal and Procedural Requirements

This Settlement Officer verifies that she has had no prior involvement with respect to the specific tax periods either in Appeals or Compliance.

The collection statute has been suspended; the collection period allowed by statute to collect these taxes has been suspended by the appropriate computer codes for the tax periods at issue.

Collection followed all legal and procedural requirements and the actions taken or proposed were appropriate under the circumstances.

Issues relating to the unpaid liability

Initially, on the Form 12153, Request for a Collection Due Process Hearing for the taxable years 2004, 2005 and 2007, the taxpayer stated that he originally requested an offer in compromise. The taxpayer also wrote on the Form 12153 that he had arranged for installment payments that were not deducted under multiple court ordered payments.

During the telephone hearing held by the Memphis Settlement Officer on April 1, 2011, the Representative challenged the 2007 tax liability. This was because the taxpayer indicated he had not received credit for the Federal Income Withheld that year.

The taxpayer was given the proper time to file an amended income tax return for 2007. This resulted in the taxpayer receiving credit for his withholding and the liability extinguished. The Memphis Settlement Officer documented that the taxpayer did not raise any liability issues for 2004 or 2005.

As mentioned before, on April 15, 2011, the $4,000.00 offer in compromise was faxed to the Memphis Settlement Officer. After the preliminary determination was made to reject the offer, Appeals agreed with the Centralized Offer in Compromise initial call. The

[*36] Notice of Determination was issued resulting in the case being remanded to Appeals.

During the supplemental hearing held by Settlement Officer Linda Hartfiel, the October 27, 2011 charts were verified received by the representative and discussed in detail. However, the representative did not understand why the taxpayer's offer in compromise was not accepted by the Service.

Ms. Hartfiel explained that an offer is compromised [sic] of two components:

1.) equity in assets
2.) money left over at the end of the month after basic living expenses are paid.

After verifying the taxpayer's financial condition had not changed, the representative was told the reasons that the offer in compromise was rejected. In addition, the Notice of Federal Tax Lien was also reviewed.

Of the many issues raised during the supplemental hearing, one of note was that the representative wanted the offer calculated based on the taxpayer's past financial condition. She insisted that the offer be calculated to compute his ability to pay using the income that the taxpayer earned in the years that he was trying to compromise. Appeals explained that when an offer such as this is filed, the requirement is that the taxpayer's current financial condition be evaluated.

Offer in Compromise Discussion

By applying this standard, Appeals determined that the taxpayer has equity in assets as well as a monthly surplus of funds that allows him the ability full pay the taxes. Specifically, the taxpayer has an investment/retirement account valued for offer in compromise purposes at $12,734. This amount alone is more than the liability.

However, the taxpayer has other assets to total $15,134. On top of the assets, the taxpayer can pay $115.00 a month after meeting basic living costs. This is based on income of $6,553 and monthly ordinary and necessary expenses of $6,438. When the total of the offer in compromise calculations exceeds the tax liability, the taxpayer will not receive an offer in compromise.

Additional issues raised relating to the unpaid liability

Ms. Hartfiel accommodated every request for information well above the court's requirements. For example, when the representative questioned the amount of penalty and interest charged, computer computations reflecting these charges were provided. When the representative wanted additional time to consult actuarial tables regarding the accuracy of the charges, Ms. Hartfiel obliged Ms. Parhan [sic].

However, when Ms. Parhan [sic] raised the taxpayer's liabilities for the taxable years 2004 and 2005, Ms. Hartfiel advised her that

[*37] she was precluded from doing so. This is because the taxpayer previously had the opportunity in the April 1, 2011 hearing to raise any liability issues. At that time she raised 2007 as an issue. The Memphis Settlement Officer clearly documented that the taxpayer did not raise any liability issues for 2004 or 2005. Furthermore, the representative tried to raise issues that were not part of either the initial CDP hearing or raised by the taxpayer in his petition before the Tax Court. Even though the taxpayer can pay the liability in full, Ms. Hartfiel offered the collection alternative of an installment agreement on several occasions to the taxpayer through his representative, Ms. Parhan [sic]. The acceptable minimum monthly payment amount was $60. Each time the offer was declined.

Finally, the representative sent respondent's Counsel David Mora correspondence dated May 7, 2013. Mr. Mora received the information on May 9, 2013. In it, Ms. Parhan [sic] requested that the attorney get involved with the case. This is because the supplemental hearings did not achieve the outcome Ms. Parhan [sic] wanted.

In general, as Office of Chief Counsel does not involve itself in the issues of Collection Due Process cases, the correspondence was provided to Ms. Hartfiel for review. Ms. Hartfiel considered all of the information submitted. However, the documents did not change the fact that the offer in compromise is not a viable option for the taxpayer. Furthermore, the taxpayer declined the offer of an installment agreement of $60.00 per month.

Appeals met the court requirements of the remanded cases. Two hearings were held with the representative where the rejected offer in compromise was discussed in detail.

The taxpayer's current financial condition has not changed to his detriment. Since the taxpayer can full pay, the representative was advised that the offer in compromise was rejected. Furthermore, the collection alternative of an installment agreement was declined. The representative's request in her May 7, 2013 correspondence to call it even or settle for $1,587.06 is denied.

The Settlement Officer reviewed the criteria to withdraw a Notice of Federal Tax Lien under IRC § 6323(j). No information or documentation was submitted confirming that withdrawal of the lien would facilitate collection.

Lien Withdrawal

IRC § 6323(j) gives the Service the authority to withdraw Notices of Federal Tax Lien under certain circumstances. The NFTL may be withdrawn under the following conditions:

  (a) the filing of the notice was premature or otherwise not in accordance with the Services administrative procedures,
  (b) the taxpayer entered into an agreement under Section 6159 to satisfy the tax liability for which the lien was imposed by means of installment payments, unless such agreement provides otherwise,

**[\*38]**
>          (c) withdrawal of such notice will facilitate the collection of
>          the tax liability, or
>          (d) with the consent of the taxpayer or the National
>          Taxpayer Advocate, the withdrawal of such notice would be in
>          the best interest of the taxpayer (as determined by the
>          National Taxpayer Advocate) and the United States.
>
> None of these conditions have been met.  Therefore, there is no
> basis for withdrawing the lien.
>
> No additional issues were raised.
>
> <u>Balancing efficient tax collection with concern regarding
> intrusiveness</u>
>
> IRC Section § [sic] 6330(c)(3)(C) requires that the Settlement
> Officer determine if the filed Notice of Federal Tax Lien balances
> the need for efficient collection of the taxes with the legitimate
> concern of the taxpayer that any collection action be no more
> intrusive than necessary.  No collection alternative to the tax
> lien was proposed by the taxpayer.
>
> The IRS followed proper procedures in filing the tax lien.  The
> filing of a tax lien was necessary to protect the government's
> interest against third party creditors.  It is the determination
> of Appeals that the filed tax lien balances the need for efficient
> collection of taxes with the taxpayer's legitimate concern the
> action is no more intrusive than necessary.
>
> <u>Conclusion</u>
>
> The supplemental hearing was held as directed by the Court with
> the petitioner given the opportunity to receive and discuss the
> offer in compromise computations that were used when the Memphis
> Settlement Officer determined rejection was the correct decision.
> The outcome of the hearings was that the $4,000 offer dated April
> 15, 2011 was correctly rejected and the decision is sustained.  In
> addition, the filing of the lien is also upheld as it is needed to
> protect the government's interest against other creditors.

4.    <u>Trial</u>

On October 25, 2013, the Court notified Drilling and the IRS that the case

would be tried during the trial session beginning March 17, 2014, in Houston,

Texas.

**[\*39]** On March 17, 2014, the first day of the trial session, the IRS filed a motion to dismiss the case on grounds of mootness as to the tax years 2004 and 2007. On March 18, 2014, Drilling filed a response to the motion. The Court reserved ruling on the motion. On March 18 and 19, 2014, the Court held the trial. After the trial, the parties filed simultaneous opening briefs and then simultaneous answering briefs. In his opening brief, Drilling attached various documents: provisions of the Internal Revenue Manual, portions of the Internal Revenue Code, IRS publications, an IRS news release, and internal IRS memoranda. The IRS moved to strike these attachments to his brief on the grounds that they: (1) are irrelevant, (2) are not in the trial record, and (3) were not provided by Drilling to counsel for the IRS before trial.

OPINION

In his opening brief Drilling identifies three errors that he contends were made by the Appeals Office: (1) failing to "release" the lien for 2007, (2) mishandling his $4,000 offer-in-compromise, and (3) failing to correct the amounts of his tax liabilities. We discuss each of these alleged errors in turn.

1. <u>Withdrawing notice of lien or releasing lien for 2007</u>

On May 11, 2010, the IRS filed a notice of lien to collect income-tax liabilities from Drilling for tax years 2004, 2005, and 2007. Drilling contends that

[*40] the lien was "premature or otherwise not in accordance with administrative procedures of the Secretary", that it was "improperly filed", and complains that the IRS has yet to "release" the lien. In support of his arguments, Drilling relies on the following factual propositions:

- In April 2008 he filed his 2007 tax return, reporting the amount of tax that had been withheld from his wages for 2007.

- He attached to this return his Form W-2 from his employer showing the amount of withholding. (We have found, however, that he did not attach the Form W-2.).

- Taylor-White, the settlement officer who handled the initial collection-review hearing, confirmed that Drilling had not been given credit for the withholding.[11]

The IRS's responses to these arguments are threefold. First, the IRS argues that when the notice of lien was filed, Drilling "was not entitled to the withholding credit for the taxable year 2007 because he refused to provide respondent [the IRS] with substantiation for this credit." The notice of lien was filed on May 11, 2010. It was not until April 15, 2011, the IRS argues, that Drilling provided

---

[11]Settlement Officer Taylor-White's notes of the April 1, 2011 teleconference state: "[R]eview of IRPTRL/TXMOD for 2007 show tp wasnt [sic] given credit for $14,219 of fit".

[*41] substantiation for the credit. (On April 15, 2011, Parham faxed a Form W-2 to the Appeals Office reflecting that Drilling's employer had withheld $14,130 from his wages for federal income tax.) At some point thereafter, the IRS credited Drilling $14,130 for 2007. The IRS concludes that "[t]he lien met the requirements of I.R.C. § 6323 with respect to the taxable year 2007 at the time it was filed." Second, the IRS contends that Drilling did not raise the arguments at the administrative level.[12] Third, the IRS contends that the case should be dismissed as moot as it relates to the 2007 year. It contends that it has determined that Drilling has fully paid his liability for the 2007 tax year, that as a matter of law "once respondent concedes that there is no unpaid liability for the year in dispute upon which a lien or levy could be based, the case is moot",[13] and that the IRS does not need to, or intend to, take collection action with respect to Drilling's 2007 liability.

---

[12]In its opening brief the IRS states: "In this case the petitioner [Drilling] appears to contend that the notice of federal tax lien was filed prematurely with respect to the taxable year 2007 because during the initial collection due process hearing the respondent [the IRS] conceded the petitioner's liability for that period." It asserts: "[T]he petitioner did not raise this issue during the collection due process hearing or the supplemental collection due process hearing." Drilling contends that he did raise the arguments.

[13]For this legal proposition the IRS cites Chou v. Commissioner, T.C. Memo. 2007-102, slip op. at 17 (citing Greene-Thapedi v. Commissioner, 126 T.C. 1, 7 (2006)).

**[\*42]** A taxpayer's liability for a tax is initially established when the IRS makes a bookkeeping entry called an "assessment". Sec. 6203 (assessment is made by recording the liability of the taxpayer in the office of the Secretary of the Treasury); see Michael I. Saltzman, IRS Practice & Procedure, para. 14A.05, at 14-34 (rev. 2d ed. 2002 updated to 2016) ("A taxpayer's liability for a tax is established by an assessment of the tax."). After the IRS assesses tax, it must demand payment of the tax. Sec. 6303(a). The demand must be made within 60 days of assessment. Id. If the taxpayer (i.e., the "person liable to pay" the "tax") fails to pay the tax after payment is demanded, a lien is imposed in favor of the United States on all the taxpayer's property by operation of section 6321. Section 6322 provides that the lien imposed by section 6321 arises once the IRS has made an assessment.[14] The lien continues until the liability for the amount assessed "is satisfied or becomes unenforceable by reason of lapse of time." Sec. 6322.

---

[14]Under sec. 6321, a lien is imposed only if the person is "liable to pay" the tax. For sec.-6321 purposes, a person is liable to pay a tax if the tax is assessed. See Michael I. Saltzman, IRS Practice & Procedure, para. 14.05, at 14-33 (rev. 2d ed. updated to 2016). Secs. 6321 and 6322 have been interpreted to make assessment a precondition of the lien. William D. Elliot, Federal Tax Collections, Liens, and Levies, para. 9.03, at 9-6 to 9-7 (2d ed. 2014) (although sec. 6321 does not mention assessment, "the mainstream view is that sections 6321 and 6322 are read together and thus a tax assessment is required before a tax lien is created.").

**[*43]** The lien imposed by section 6321 does not transfer custody of the property to the federal government. William D. Elliott, Federal Tax Collections, Liens, and Levies, para. 9.05, at 9-15 (2d ed. 2014); Saltzman, supra, para. 14A.04, at 14-30.[15] Rather, it establishes the priority of the government's rights to property over the rights of the taxpayer and certain types of creditors. See Minn. Dep't of Revenue v. United States, 184 F.3d 725, 727-729 (8th Cir. 1999) (unfiled federal tax lien prevails against subsequent unperfected state tax lien); Superpumper, Inc. v. Nerland Oil, Inc. (In re Nerland Oil, Inc.), 303 F.3d 911, 917 (8th Cir. 2002) (federal tax lien based on assessments occurring in 1993 and 1994 took priority over claim of private creditor whose lien was perfected in 1996); Steven R. Mather & Paul H. Weisman, Federal Tax Collection Procedure--Liens, Levies, Suits and Third Party Liability, 637-2d Tax Mgmt. (BNA), at A-5 (2013). Once the lien arises, the IRS[16] can seize the property subject to the lien through its levy power.

---

[15]The filing of a notice of lien, an action discussed later, also does not transfer custody of the property to the government. Elliott, supra, para. 10.03, at 10-5.

[16]Like many of the statutory provisions governing federal tax collection, the statute authorizing the IRS to levy does not refer to the IRS but to the "Secretary", which means the Secretary of the Treasury and his delegates. See sec. 7701(a)(11)(B) and (12)(A)(i). In practice the Secretary has delegated the tax collection powers to the IRS. See, e.g., sec. 301.6331-1(a)(1), Proced. & Admin. Regs. For simplicity, we refer to the IRS rather than the Secretary when referring
(continued...)

[*44] Secs. 6331(a), 6332; Saltzman, supra, para. 14A.04, at 14-30 to 14-31.[17]

The property is then sold. See secs. 6335, 6342. As an alternative to seizing the property, the government can convert its tax lien into money through a lien-foreclosure suit, a type of action established by section 7403. See Saltzman supra, para. 14A.09[2], at 14-91 (rev. ed. 2002 updated to 2016) (explaining why the government might proceed by a lien-foreclosure suit rather than seize property through levy). Section 7403(a) provides that the Attorney General may direct that a civil action be filed in U.S. District Court "to enforce the lien of the United States" under the Internal Revenue Code. The U.S. District Court will "finally determine the merits of all claims to and liens upon the property" and "where a claim or interest of the United States therein is established" may sell the property and distribute the proceeds to the United States and other claimants. Sec. 7403(c).

The lien imposed by section 6321 is not valid against four types of persons (purchasers, security-interest holders, mechanic's lienors, and judgment-lien creditors) until the IRS files a notice of lien. Sec. 6323(a). The IRS files the

---

[16](...continued)
to those collection statutes.

[17]Before it can make the levy, though, it must give the taxpayer 30 days to request a collection-review hearing with its Appeals Office. Sec. 6330(a)(1), (2), (3)(B).

**[\*45]** notice of lien with the government of the state or local area in which the property is located. Sec. 6323(f). The notice is a public document. Elliott, supra, para. 10.01, at 10-2. It serves as a warning to subsequent purchasers or lenders that those persons' interests in the property will be lower in priority than the interest of the United States. Id.; Saltzman, supra, para. 14A.04, at 14-31.

Section 6323(j)(1) provides that the IRS may "withdraw" a filed notice of lien in various circumstances, one of which is if the IRS determines that "the filing of such notice was premature or otherwise not in accordance with administrative procedures of the Secretary [of the Treasury]." Sec. 6323(j)(1)(A). The IRS withdraws a notice of lien by filing a notice of lien withdrawal with the same governmental office with which it filed the notice of lien. Sec. 6323(j)(1). The effect of withdrawing the notice of lien is that the relevant Internal Revenue Code provisions are "applied as if the withdrawn notice had not been filed". Id.

Section 6325(a) requires the IRS, "[s]ubject to such regulations as the Secretary [of the Treasury] may prescribe", to "issue a certificate of release of any lien imposed with respect to any internal revenue tax not later than 30 days after the day * * * [t]he Secretary [i.e., the IRS] finds that the liability for the amount assessed, together with all interest in respect thereof, has been fully satisfied or has become legally unenforceable". Regulations under section 6325(a) provide that

**[\*46]** when a filed notice of lien lists multiple tax liabilities, the IRS "shall" issue

a certificate of release no later than 30 days after finding that all the tax liabilities

listed in the notice of lien have been fully satisfied or have become legally

unenforceable (unless the taxpayer requests the issuance of a certificate of release

with respect to a particular liability listed in the notice). See sec. 301.6325-

1(a)(1), (6), Proced. & Admin. Regs. Section 6325(f) provides that if the IRS

issues a certificate of release of lien and also files the certificate with the same

governmental office with which it filed the notice of lien, then the lien referred to

in the notice is extinguished.

Section 6326 provides:

(a) In General.--In such form and at such time as the Secretary [i.e., the IRS] shall prescribe by regulations, any person shall be allowed to appeal to the Secretary [i.e., the IRS] after the filing of a notice of a lien under this subchapter [secs. 6320 to 6327] on the property or the rights to property of such person for a release of such lien alleging an error in the filing of the notice of such lien.

(b) Certificate of Release.--If the Secretary [i.e., the IRS] determines that the filing of the notice of any lien was erroneous, the Secretary [i.e., the IRS] shall expeditiously (and, to the extent practicable, within 14 days after such determination) issue a certificate of release of such lien and shall include in such certificate a statement that such filing was erroneous.

See sec. 301.6326-1, Proced. & Admin. Regs.

[*47] In 1998 Congress amended the Internal Revenue Code to require that any time the IRS files a notice of lien, it must offer the taxpayer a collection-review hearing (also known as a collection-due-process hearing). Sec. 6320(a). If requested by the taxpayer, the hearing is conducted by the IRS Appeals Office. Sec. 6320(b)(1). The pertinent procedures for the hearing are the same as those governing hearings related to levies. Sec. 6320(c). The procedures for hearings involving levies are set forth in section 6330(c). First, the settlement officer handling the hearing must obtain verification from the IRS that the requirements of any applicable law or administrative procedure have been met. Sec. 6330(c)(1). Second, the taxpayer may "raise at the hearing any relevant issue relating to the unpaid tax or the proposed levy" [or notice of lien[18]], including challenges to the appropriateness of the collection action and offers of collection alternatives (such as offers-in-compromise or installment agreements). Sec. 6330(c)(2)(A). Section 6330(c)(2)(B) provides that the taxpayer may contest the existence and amount of the underlying tax liability, but only if he or she did not receive a notice of deficiency or otherwise have an opportunity to dispute the tax liability. After

---

[18]In Thompson v. Commissioner, 140 T.C. 173, 178 (2013), we stated: "If a taxpayer requests a CDP hearing in response to an NFTL or a notice of intent to levy, he may also raise at that hearing any other relevant issue relating to the unpaid tax or the proposed levy or lien. Secs. 6330(c)(2), 6320(c)."

[*48] considering those issues, the Appeals Office is to issue its notice of determination. See sec. 6330(c)(3). If the taxpayer is not satisfied with the determination of the Appeals Office, the taxpayer may "appeal such determination to the Tax Court". Sec. 6330(d)(1). In such an appeal, the standard of review employed by the Tax Court is abuse of discretion, except with respect to the existence or amount of the underlying tax liability, for which the standard of review is de novo. Goza v. Commissioner, 114 T.C. 176, 181-182 (2000). The evidentiary scope of review employed by the Tax Court is de novo. Robinette v. Commissioner, 123 T.C. 85, 101 (2004), rev'd, 439 F.3d 455, 459-462 (8th Cir. 2006). That means that the Court's review is not confined to evidence in the administrative record. See Speltz v. Commissioner, 124 T.C. 165, 177 (2005) (citing Robinette v. Commissioner, 123 T.C. at 94-104), aff'd, 454 F.3d 782 (8th Cir. 2006). If the Court remands a case to the Appeals Office, the further hearing is a supplement to the original hearing, not a new hearing, Kelby v. Commissioner, 130 T.C. 79, 86 (2008), but the position of the Appeals Office that the Court reviews is the position taken in the supplemental determination, id.

Drilling's challenge to the Appeals Office's handling of the notice of lien filing for the 2007 tax year rests on the factual predicate that he attached a Form W-2 to his Form 1040EZ for 2007. He contends: "Respondent lost the requisite

[*49] W-2 attached to the Form 1040 when filed."[19]  However, as we found,

Drilling did not attach a Form W-2 to his Form 1040EZ for 2007.  Thus we

disagree with the factual predicate of Drilling's challenge, i.e., that he filed a Form

---

[19]Along the same lines, he argues:

```
It is substantiated by the record only that Respondent requested
Petitioner to provide a Form W-2.  [The IRS's letter to Drilling,
dated June 4, 2008, stated that it had received his Form 1040EZ
but that it needed a Form W-2.]  The record did not substantiate
that Petition [sic] did not provide one with the original filing,
only that Respondent could not find the one provided.
```

[*50]  W-2.  We reject his challenge and hold that the Appeals Office did not err

in its determination as to the lien for 2007.[20]

_____

[20]Drilling's challenge to the Appeals Office's handling of the notice of lien filing for the 2007 tax year apparently relates to both (1) the Appeals Office's failure to withdraw the notice of lien (because his contention that the lien was "premature or otherwise not in accordance with administrative procedures of the Secretary" repeats the words of sec. 6323(j)(1)(A), the provision permitting the IRS to withdraw a lien notice) and to (2) the Appeal Office's failure to release the lien (because he complains that the IRS has yet to "release" the lien).  It occurs to us that Drilling could have made the alternative argument that, even if he had not filed a Form W-2, the Appeals Office still erred either by not withdrawing the lien filing or by not releasing the lien, or both.  However, neither party briefed this alternative argument.  We decline to consider the alternative argument because to do so would be to consider an issue not raised by the parties.  See Munford, Inc. v. Commissioner, 87 T.C. 463, 495 n.35 (1986), aff'd, 849 F.2d 1398 (11th Cir. 1988).  We entertain Drilling's actual argument (that is based on his factual assertion that he attached a Form W-2 to his return), but there is substantial reason to believe that the alternative argument would present different legal issues.  As to whether the Appeals Office should have withdrawn the lien notice, recall that sec. 6323(j)(1) provides that the IRS may withdraw the filing of a notice of lien if the filing of the notice was not in accordance with administrative procedures.  Although the parties have not supplied us with their views as to the administrative procedures governing the filing of a notice of lien, one would suppose that it would not be in accordance with administrative procedures for the IRS to file a notice of lien when it has determined there is no balance due.  The trial record suggests that--at some point after the filing of notice of lien--the IRS determined there was no balance due for 2007.  In June 2011 the IRS made entries in its records that reflected that Drilling had no liabilities for 2007.  And on January 31, 2012, the Appeals Office (in its initial notice of determination) acknowledged that Drilling no longer had a balance due for 2007.  However, sec. 6323(j)(1) arguably tests the procedural validity of a notice of lien at the time the notice was filed.  It allows the IRS to withdraw a notice if "the filing of such notice was * * * not in accordance with administrative procedures".  (Emphasis added.)  The notice of lien was filed on May 11, 2010.  Thus, the notice was filed before the June 2011

(continued...)

**[\*51]** Finally, we consider the IRS's argument that the case is moot as to the year 2007.[21] We disagree that the case is moot. Where, as here, the taxpayer seeks to withdraw a filed lien notice, and the notice has not been withdrawn nor the lien released, the case is not moot merely because the taxpayer has paid the related

---

[20](...continued)
recordkeeping entries and the January 31, 2012 notice of determination evincing the IRS's determination that no balance was due for 2007. As to whether the Appeals Office should have released the lien, we similarly observe that sec. 6326(b) arguably tests the procedural validity of a notice of lien at the time the lien was filed. It provides that if the IRS "determines that the filing of the notice of any lien <u>was</u> erroneous" (emphasis added) it shall issue a release of the lien. And although another provision, sec. 6325(a), directs the IRS to release a lien if it finds the liability for the amount of the lien has been fully satisfied, here the notice of lien listed liabilities for three tax years: 2004, 2005, and 2007. Although the IRS concedes there is no liability for 2007, it contends there is a liability for 2005. (The IRS also concedes the 2004 liability has been paid. This concession was made by the IRS in this litigation. It is unclear that such a determination had been made when the Appeals Office was considering the case.) Although the IRS must release a lien under sec. 6325(a) at the request of the taxpayer if the amount of the lien is only partly satisfied, there is no evidence that Drilling requested the issuance of a certificate of release of the lien with respect to a particular liability, i.e., the 2007 liability listed in the notice. <u>See</u> sec. 301.6325-1(a), Proced. & Admin. Regs. Thus, it appears that the conditions for releasing the lien were not satisfied. Furthermore, it appears that Drilling never brought up the issue of lien release at the Appeals Office. A taxpayer must raise an issue before the Appeals Office before the Tax Court can consider the issue. Sec. 301.6330-1(f)(2), Q&A-F3, Proced. & Admin. Regs.

[21]The Tax Court cannot constitutionally resolve an issue that is moot because such an issue is not part of a case or controversy under art. III, sec. 2, of the U.S. Constitution, which extends the "judicial power" to various enumerated types of "Cases" and "Controversies". <u>See</u> <u>Greene-Thapedi v. Commissioner</u>, 126 T.C. at 6 n.9.

[*52] liability. A lien-notice filing can cause injury to a taxpayer even after the underlying liability has been paid. See William T. Plumb, Jr., "The Creation, Removal, and Impact of Tax Liens", 20 Prac. Law. 75, 84-85 (1974) ("Consummation of a transaction in which a taxpayer might desire to engage may be seriously impeded if notice of a general tax lien is on file in the appropriate public office, even if the taxpayer has actually paid the delinquency secured by the lien."). The cases cited by the IRS on the question of mootness are inapposite. In Greene-Thapedi v. Commissioner, 126 T.C. 1, 5 (2006), the taxpayer appealed a determination of the Appeals Office after a collection-review hearing regarding a proposed levy for 1992. The IRS had eliminated the taxpayer's 1992 tax liability by applying an overpayment for 1999. Id. at 5-6. The taxpayer nonetheless sought the Court's determination of the amount of her 1992 tax liability. Id. at 8. The Court held that the proposed levy (and the case) was moot. Id. at 7. Unlike the taxpayer in Green-Thapedi, who sought only to challenge the amount of her tax liability for 1992, Drilling seeks the withdrawal of the notice of lien. Chou v. Commissioner, T.C. Memo. 2007-102, is distinguishable on similar grounds. The taxpayers in Chou sought a determination of their tax liability for 2001 in a collection-review case involving a proposed levy and a lien-notice filing for 2001. Id., slip op. at 14. The IRS conceded that the taxpayers owed no tax for 2001, and

**[*53]** the Court held the case was moot.  Id. at 14-17.  The Chou opinion does not reveal that the taxpayers argued that the lien notice should be withdrawn, as Drilling has done in this case.  We hold that this case is not moot as to tax year 2007.[22]

2.     The $4,000 offer-in-compromise

In April 2011 Drilling made an offer-in-compromise (on Form 656) in which he proposed to pay $4,000 over 20 months to compromise his liabilities for 2004, 2005, 2006, 2007, 2008, 2009, and 2010.  The IRS's offer-in-compromise specialist recommended that the offer be rejected because she determined that the reasonable collection potential was $28,934.40, comprising $15,134.40 of net equity in assets and $13,800 of future income.  Settlement Officer Taylor-White, who handled the initial collection-review hearing, rejected the offer-in-compromise on behalf of the Appeals Office because, she alleged, Drilling had failed to rebut the analysis of the offer-in-compromise specialist.  During the supplemental collection-review hearing, Settlement Officer Hartfiel sent Drilling the offer-in-compromise specialist's workpapers and met with Parham.  Hartfiel

_____

[22]As explained infra p. 69, we also hold that the case is not moot with respect to tax year 2004.

**[*54]** rejected the offer-in-compromise on behalf of the Appeals Office, asserting that Drilling could fully pay his liabilities.

Drilling contends that the Appeals Office made three general errors in considering his $4,000 offer-in-compromise. First, Drilling contends that the Appeals Office miscalculated the "reasonable collection potential" in various ways. Second, Drilling contends that the Appeals Office ignored special circumstances that would have required acceptance of the offer-in-compromise. Third, Drilling contends that the Appeals Office erred because, he alleges, it failed to make a counteroffer. We discuss each of these three general alleged errors in greater detail below.

a.     Reasonable collection potential

Drilling alleges that the Appeals Office miscalculated the reasonable collection potential in two ways. First, Drilling contends that the Appeals Office should have calculated his future income over 24 months or 60 months, not 120 months. Second, Drilling contends the Appeals Office erred in calculating the value of his assets.

As Settlement Officer Hartfiel testified, reasonable collection potential is an arithmetic function used by the IRS in evaluating offers-in-compromise. Reasonable collection potential is generally the sum of two amounts: equity in

[*55] assets and future income. Equity in assets is the value of the taxpayer's assets minus debts. Future income is monthly income left over after monthly expenses, aggregated over a certain number of months. See also Johnson v. Commissioner, 136 T.C. 475, 485 (2011) (describing the concept of reasonable collection potential), aff'd, 502 F. App'x 1 (D.C. Cir. 2013). The Appeals Office evaluated Drilling's offer-in-compromise by using 120 months of future income. It rejected the offer-in-compromise on the ground that Drilling could fully pay his tax liability out of the two components of reasonable collection potential, equity in assets and future income. Drilling contends that the Appeals Office erred in projecting 120 months of future income and that it should have projected only 24 months or 60 months.

Drilling contends the Appeals Office made two errors in calculating the value of his assets. First, Drilling contends that the Appeals Office should have determined that the available value of his retirement plan is $5,289.20. This amount is equal to $7,445.20, which is 50% of the quick-sale value of the plan, minus $2,156 of encumbrances. According to Drilling, this amount was appropriate because he was permitted to borrow only 50% from his retirement plan. The IRS contends that in calculating the value of Drilling's retirement plan "a proper discount was allowed" and "even if the respondent had provided an

**[*56]** additional discount the petitioner's RCP would still exceed the petitioner's tax liabilities and the amount offered in his offer in compromise."

The second error Drilling alleges was made by the Appeals Office in calculating his available assets was that the Appeals Office should have reduced his available assets for the $4,000 judgment against Drilling for child-support arrearages and the $105,000 judgment against Drilling for criminal restitution. Drilling contends that the two judgments "affect the net equity in assets because a State judgment or child/medical support judgment issued prior to an IRS judgment could take precedence over an IRS judgment against the assets." The IRS contends that "certain of the expenses allowed by the respondent in determining the petitioner's RCP would disappear during the collection period and that no adjustments were made for either increases or decreases in the petitioner's expenses."[23] The IRS also contends that it was not an abuse of discretion to reject the offer-in-compromise because the amount offered, $4,000, is less than the reasonable collection potential, even after making some of the adjustments to reasonable collection potential urged by Drilling.[24]

---

[23]We need not address this contention.

[24]As we explain below, we agree with this contention.

[*57] In addressing the parties' dispute about how reasonable collection potential should have been calculated, we first consider the effect of the two judgments. As we explain, we conclude that the Appeals Office appropriately considered the effect of these two judgments on reasonable collection potential. Drilling alluded to the two judgments on his Form 656. Under the form's section entitled "Explanation of Circumstances", Drilling explained that he had been in jail, was on probation and "conditional bond", and had been "assigned with the task of child support (now more than 800/mo) and restitution to my ex-wife in addition to the court ordered fees associated with probation." On the accompanying collection-information statement (i.e., the Form 433-A), Drilling filled out a table for his monthly incomes and expenses. Under the expense category for "Court Ordered Payments", Drilling entered $1,120. When he submitted the collection-information statement to the Appeals Office, Drilling included a copy of a court order that: (1) awarded a $4,000 judgment against him for failing to pay child support, (2) required him to pay the $4,000 through installments of $50 per month, and (3) required him to pay an additional $100 per month in medical support. He also included a copy of a court order requiring him to pay $859.86 per month in child support and a copy of a court order requiring him to pay $150 per month on a $105,000 criminal-restitution judgment. These monthly amounts of court-ordered

[*58] judgments ($50, $100, $859.86, and $150) add up to $1,159.86. This is close to the $1,120 Drilling reported as "Court Ordered Payments", which is also the amount the IRS's offer-in-compromise specialist used in calculating monthly income available for paying tax. The specialist used these monthly income projections, combined with her estimate of Drilling's assets, to arrive at reasonable collection potential. The Appeals Office, in its initial determination to sustain the filing of notices of lien, observed that "[t]here were no significant differences" between the amounts reported by Drilling in the collection-information statement and the specialist's workpapers, and the Appeals Office rejected Drilling's offer-in-compromise. The Court remanded the case to the Appeals Office, which gave Drilling the specialist's workpapers and met with his representative, Parham. In its supplemental determination, the Appeals Office again relied on the offer-in-compromise specialist's workpapers to reject the offer-in-compromise. It appears to us that the specialist (and the Appeals Office) took into account the $4,000 child-support-arrearage judgment and the $105,000 criminal-restitution judgment in calculating Drilling's monthly income. The Appeals Office reduced Drilling's income by $150 per month for the child-support-arrearage judgment and $150 per month for the criminal-restitution judgment. If the Appeals Office had also reduced the estimate of Drilling's assets by the total amount of the judgments, it

[*59] would have double counted the effect of the judgments. In our view the Appeals Office did not err in evaluating the effect of the two judgments on Drilling's ability to pay his tax liabilities, i.e., his reasonable collection potential.

Thus, we reject Drilling's argument that the Appeals Office should have made additional adjustments to reasonable collection potential for the two judgments against him. Drilling's remaining proposed corrections to reasonable collection potential are that: (1) the preencumbrance value of his retirement plan was $7,445.20, not $14,890.40 as determined by the offer-in-compromise specialist and (2) the number of months of available income should be 24 months or 60 months, not 120 months. Even with these two corrections, the reasonable collection potential would be still be $10,449.20. The table below explains the calculation of this $10,449.20 amount:

Reasonable collection potential
Positions of the parties
(Number of months refers to the number of months of available income)

| | IRS (120 months) | Drilling (60 months) | Drilling (24 months) |
|---|---|---|---|
| Retirement plan | | | |
| Before encumbrance | $14,890.40 | $7,445.20 | $7,445.20 |
| Encumbrance | 2,156.00 | 2,156.00 | 2,156.00 |
| After encumbrance | 12,734.40 | 5,289.20 | 5,289.20 |

| | | | |
|---|---|---|---|
| [*60] Assets other than retirement plan | 2,400.00 | 2,400.00 | 2,400.00 |
| Total assets | 15,134.40 | 7,689.20 | 7,689.20 |
| Number of months of income | 120 | 60 | 24 |
| Monthly net income | 115.00 | 115.00 | 115.00 |
| (Monthly net income) × (months) | 13,800.00 | 6,900.00 | 2,760.00 |
| Reasonable collection potential | 28,934.40 | 14,589.20 | 10,449.20 |

The reasonable collection potential urged by Drilling, $10,449.20, is more than the amount he offered, $4,000. We have held that the Appeals Office does not abuse its discretion in rejecting an offer-in-compromise when the amount offered is less than the reasonable collection potential. See Murphy v. Commissioner, 125 T.C. 301, 320 (2005), aff'd, 469 F.3d 27, 33 (1st Cir. 2006); Brombach v. Commissioner, T.C. Memo. 2012-265, at *21. We find that the Appeals Office did not abuse its discretion in rejecting Drilling's $4,000 offer-in-compromise. Drilling offered less than the reasonable collection potential, even assuming he is correct that the Appeals Office should have used 24 months of income in calculating reasonable collection potential. Thus, it is not necessary for us to determine whether the appropriate number of months of future income that should have been used was 24 months as Drilling alleges.

**[*61]** b.     Special circumstances

Drilling contends that the Appeals Office ignored special circumstances that justified acceptance of his offer-in-compromise.  In the narrative section of his offer-in-compromise form, Drilling stated that his funds were so low that he could not afford to live on his own and had to rent only "a portion of a house."  Drilling contends that the Appeals Office should have determined, on the basis of this narrative, that he was "unable to meet his basic needs."  We hold that the Appeals Office did not abuse its discretion in its consideration of the facts revealed in the narrative.  Settlement Officer Hartfiel testified that she considered the narrative and that the circumstances described in it did not justify the acceptance of the offer-in-compromise.  Settlement Officer Hartfiel could reasonably have concluded that the mere fact that a person can afford to rent only a portion of a house does not mean that the person cannot meet basic needs (or that such a person would not meet basic needs if required to pay an additional $200 per month, the amount that Drilling proposed to pay in his offer-in-compromise).  Furthermore, the monthly income amounts used by the Appeals Office took into account Drilling's housing expenses and reflected that he still had income available after expenses to pay his tax liabilities.

**[\*62]** c.     <u>Counteroffer</u>

Drilling describes his third point of error as "NO COUNTER OFFER MADE BY REVIEWING OFFICER".  The supplemental notice of determination stated that Settlement Officer Hartfiel rejected Drilling's offer-in-compromise of $200 per month for 20 months and proposed an installment agreement by which Drilling would pay $60 per month.  It appears that Drilling rejected this counteroffer.  Drilling argues that Settlement Officer Hartfiel's counteroffer was defective in two ways.[25]  First, the counteroffer would have resulted in "a significant overpayment of the liability owed" because of allegedly incorrect calculations of liability.  Second, Drilling argues that Settlement Officer Hartfiel's counteroffer, which was $60 per month, had no limit to the number of months Drilling would be required to make payments and that "Payments of $60.00 for an unending period of time is not an offer."

In response, the IRS argues that the Appeals Office is not required to make counteroffers before rejecting a taxpayer's offer.  It further argues that during the supplemental hearing, after having been given the offer-in-compromise

---

[25]In support of his view that the Appeals Office had a duty to make a counteroffer, Drilling relies on Internal Revenue Manual pt. 5.8.1.9.4(1) (Feb. 26, 2013), which states in part:  "Acceptable offer payment terms should be determined by the OE or the OS and should not be limited to the proposal of the taxpayer."

[*63] specialist's workpapers, Drilling did not amend his offer or make a new offer, and that Drilling rejected the settlement officer's counteroffer. In response to Drilling's argument that the Appeals Office did not correct the IRS's computations of tax liability in considering the offer, the IRS contends that the Appeals Office may legally rely on account transcripts for the purpose of determining that all legal and administrative requirements have been met.

We need not address all of the arguments described above regarding the handling of the counteroffer. We have held that it is not an abuse of discretion if the Appeals Office rejects the taxpayer's offer without engaging in any further negotiations with the taxpayer. See Kreit Mech. Assocs. v. Commissioner, 137 T.C. 123, 134 (2011); see also Fargo v. Commissioner, 447 F.3d 706, 712-713 (9th Cir. 2006) ("But even taking Taxpayers at their word that the Manual exhorts Appeals Officers to negotiate before rejecting an offer-in-compromise, their contention that they were owed a duty of negotiation is incorrect."), aff'g T.C. Memo. 2004-13. Therefore, any problems in Settlement Officer Hartfiel's counteroffer do not result in judicially-correctable error.

3. Correction of amounts of tax liabilities

Drilling argues that the IRS has made several errors in calculating his tax liabilities. Drilling's brief sets forth the following four alleged errors:

[*64] ● "payments being credited to already paid accounts (2004)"

● "payments for one year being reassigned to another (2010 payment being reassigned back to 2004)"

● "lack of interest accrual on overpayments (2004, 2006, 2007)"

● "interest is accruing on liabilities which were asserted to be unpaid (2005, 2008, 2010 after payment removed)"

Drilling explains that these alleged errors all involve the misapplication of his payments by the IRS and that these alleged misapplications affect his liability for penalties and interest (but not tax). He contends that, as a result of these errors, although the IRS calculated that as of July 15, 2013, he owed $5,387.54 of liability,[26] his actual liability was $1,587.06.[27]

In response to Drilling's arguments, the IRS argues that:

● To the extent Drilling is challenging the amounts of his interest and penalty liabilities for 2004 and 2005, Drilling failed to adequately raise these

---

[26]In its supplemental notice of determination the Appeals Office stated that for the 2004, 2005, and 2007 tax years Drilling owed a total of $3,151.14 (not including certain credits) and that he had "other balances" of $2,236.40 that was not part of the collection-review case. These amounts were computed as of July 15, 2013. The sum of $3,151.14 and $2,236.40 is $5,387.54.

[27]His calculation of $1,587.06 was made as of June 1, 2013.

[*65] challenges at the administrative level (with the exception of the calculation

of the withholding credit for 2007).[28]

● To the extent Drilling is contending that credits available to him for

overpaying tax for his 2004 and 2007 years should be applied to his liability

for 2005, the Court does not "have the jurisdiction under I.R.C. § 6330 to

order the application of refunds or credits" (citing Greene-Thapedi v.

Commissioner, 126 T.C. at 12-13).

● To the extent Drilling is challenging his liability for 2004 and 2007, his

claims are moot because "the petitioner's liabilities for the taxable years

2004 and 2007 have been either conceded (2007) or paid (2004) and the

respondent is no longer seeking to collect for either period."[29]

---

[28]The IRS contends that Drilling did not challenge his underlying liabilities
for the taxable years 2004 and 2005 during the initial hearing, that the initial
hearing constituted Drilling's opportunity to contest the liabilities, and that
Drilling could not contest the liability in the supplemental hearing.  As the IRS
argues:  "With respect to the taxable years 2004 and 2005 the petitioner first raised
the issue of the abatement of interest and penalties during the supplemental
collection due process hearing.  The petitioner had an opportunity during the
initial collection due process hearing that was held on April 1, 2011 to raise this
issue but failed to do so."  The IRS also contends that Settlement Officer Hartfiel
sought a written statement from Drilling detailing the basis for his request for
abatement of interest and penalties and that Drilling failed to provide her with
such a statement.

[29]We already explained, see supra part 1, that we hold the case is not moot
(continued...)

**[\*66]** •    To the extent that Drilling contends that the IRS wrongfully applied credits from the years 2006, 2010, and 2011 to his liabilities for 2004 and 2005, these credits are outside the scope of this judicial proceeding because they arose outside the years for which the lien notice was filed.

As we have explained, Drilling's claim that the IRS miscalculated his liabilities stems from Drilling's contention that the IRS misapplied various payments he made. But his position on brief that his liability totals $1,587.06 (with his payments properly applied) is not supported by any proposed findings of fact.[30] Rule 151(e)(3) requires a party to propose findings of fact in the posttrial brief:

> All briefs shall \* \* \* contain the following in the order indicated:
>
> \*      \*      \*      \*      \*      \*      \*
>
> (3) Proposed findings of fact (in the opening brief or briefs), based on the evidence, in the form of numbered statements, each of which shall be complete and shall consist of a concise statement of essential fact and not a recital of testimony nor a discussion or argument relating to the evidence or the law. In each such numbered statement, there shall be inserted references to the pages of the transcript or the exhibits or other sources relied upon to support the statement. In an answering or reply brief, the party shall set forth any objections, together with the reasons therefor, to any proposed

---

[29](...continued)
with respect to 2007.

[30]With the exception of proposed finding of fact 19, which is discussed <u>infra</u> note 31.

[*67] findings of any other party, showing the numbers of the statements to which the objections are directed; in addition, the party may set forth alternative proposed findings of fact.

In none of Drilling's proposed findings of fact does he explain what payments he made, the dates on which he made the payments, and the tax periods for which he instructed the IRS to apply the payments (if he made such an instruction).[31] The $1,587.06 amount is found on a spreadsheet prepared by Parham and attached to Parham's letter of May 7, 2013. According to Drilling's brief, the spreadsheet does not show that the $1,587.06 amount is correct, only that Drilling "has not been given proper credit for payments that have been made, and for that reason petitioner's tax liability cannot be determined with any certainty." The May 7, 2013 letter, along with the attached spreadsheet, contains explanations and

---

[31]There is one exception. Drilling's proposed finding of fact 19 is that on April 15, 2011, he mailed the IRS a check for $700 to apply to the tax year 2010. As factual support for this proposition, Drilling points to his own testimony. In his testimony, Drilling claimed that on April 15, 2011, he mailed the IRS a tax return for 2010 reporting a tax liability of $677. He also testified that he enclosed a check for the amount of the liability. While this testimony provides some support for the proposition that he made a payment on April 15, 2011 (in the amount of $677, not $700 as he proposes in his finding of fact), Drilling did not offer any of his records to corroborate the payment, such as a canceled check or a copy of a bank statement. Nor did Drilling explain how he instructed the IRS to apply the payment. Under the circumstances, we make only the finding that Drilling made a payment. We do not find the amount of the payment, i.e., whether it is $677, $700, or some other amount; the date he made the payment, i.e., April 15, 2011, or some other date; or whether the payment was accompanied by instructions on how to apply the payment.

[*68] computations of the amount that Drilling contends he owes the IRS (and concludes that the amount is $1,587.06). Despite the letter and the spreadsheet, we are unable to resolve the merits of Drilling's contention that he owes only $1,587.06. For one thing, Drilling's spreadsheet is inscrutable. We have only the printout of the spreadsheet, not the underlying formulas. And as we explained, Drilling failed to propose findings of fact in compliance with Rule 151. Had he done so, the IRS would have been required to set forth its "objections, together with the reasons therefor" in its answering brief. See Rule 151(e)(3). Thus, even if we were able to discern Drilling's contentions from his letter and the attached spreadsheet (which we cannot), we do not have the IRS's response to the contentions. Although the record contains the IRS's account transcripts, which the IRS contends show correct amounts, we cannot simply look to the account transcripts to determine the IRS's position with respect to the correct amounts of Drilling's liabilities. Not all of the entries on these account transcripts are understandable to us without further explanation. Furthermore, the record includes account transcripts for only the tax years 2003, 2004, 2005, and 2007. Drilling's arguments about his correct liabilities concern not only these years but apparently 2006, 2008, 2010, and 2011. The idea that we can discern Drilling's contentions regarding how his payments were misapplied, compare them to the IRS's

[*69] contentions regarding how the payments should have been applied, and then calculate the correct amounts of penalties and interest is undercut by Drilling's admission in his brief that on the basis of the documents in the record his "tax liability cannot be determined with any certainty."  Because Drilling failed to follow Rule 151, we hold that Drilling is precluded from arguing that his payments were misapplied.  See Lenihan v. Commissioner, T.C. Memo. 2006-259, slip op. at 4 n.3, aff'd without published opinion, 296 F. App'x 160 (2d Cir. 2008); Brewer Quality Homes, Inc. v. Commissioner, T.C. Memo. 2003-200, slip op. at 3 n.3, aff'd, 122 F. App'x 88 (5th Cir. 2004).[32]  Because he is precluded from making such a challenge, we need not consider the IRS's counterarguments to Drilling's potential challenge.  The exception is the IRS's mootness argument, which we must consider because mootness is a threshold constitutional issue.  See supra note 21. We have already explained why the dispute over the 2007 tax year is not moot.  See supra part 1.  For the same reason we consider the dispute over the 2004 tax year

_____

[32]Because Drilling did not propose findings of facts to support his contentions that payments were misapplied, we cannot determine whether his contentions are supported by evidence.  If his contentions are not supported by evidence, the contentions fail because the burden of proof belongs to Drilling.  See Rule 142(a).

**[*70]** not to be moot.[33]  We will therefore enter an order denying the IRS's motion to dismiss this case for mootness.

4.    Conclusions

In its July 29, 2013 supplemental notice of determination, the Appeals Office sustained the IRS's filing of a lien notice to secure the collection of liabilities for tax years 2004, 2005, and 2007.  As noted, several concessions have been made by the IRS and the Appeals Office:  (1) the Appeals Office determined that Drilling had no balance for 2007, (2) the IRS concedes on brief that Drilling has no balance for 2007, and (3) the IRS states that it will take no further collection action with respect to 2004 or 2007.  Despite these concessions, this case is not moot as regards to 2004 and 2007 because the IRS has not withdrawn the notice of lien or released the lien.  See supra parts 1 and 3.  Although Drilling's dispute with the IRS is not moot, Drilling's position has no merit.  See supra parts 1 and 3.  We therefore sustain the July 29, 2013 supplementary notice of determination.  Also,

---

[33]Drilling contends that the lien should be released as to both 2004 and 2007.  However, as explained supra note 20, Drilling did not request that the Appeals Office release the notice of lien.  A notice of lien must be released only if all liabilities listed in the notice of lien have been paid.  Sec. 301.6325-1(a)(1), (6), Proced. & Admin. Regs.  The IRS does not consider the liability for the 2005 tax year to have been paid in full.

**[*71]** we will deny the IRS's motion to dismiss the case for mootness as to 2004 and 2007.

The only remaining issue is the IRS's motion to strike the documents attached to Drilling's opening brief. The documents do not affect our decision and therefore we will deny the motion as moot.

To reflect the foregoing,

<u>An appropriate order and</u>

<u>decision will be entered</u>.